704 A.2d 952

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER M. CRUMB, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 10, 1997—Decided December 24, 1997.

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*Lon Taylor*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender attorney; *Mr. Taylor*, of counsel, and on the brief).

*Linda K. Danielson*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Ms. Danielson*, of counsel, and on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Defendant was indicted in Atlantic County as follows: count one, first degree murder (*N.J.S.A.* 2C:11–3(a)(1) and –3(a)(2)); count two, third degree possession of a weapon, a walking cane, with a purpose to use it unlawfully against the person of another (*N.J.S.A.* 2C:39–4(d)); and count three, assault with ill will, hatred, or bias (*N.J.S.A.* 2C:12–1(e)). Count three was severed by the trial judge, and defendant was tried before a jury from May 3 to 17, 1995. He was found guilty on both counts. On June 16,

1995, count two, possession of a weapon for an unlawful purpose, was merged with count one, murder, and defendant was sentenced to a custodial term of life with a thirty-year parole ineligibility period.

Defendant appeals, raising the following legal arguments:

POINT I

THE TOTAL OMISSION OF AN INSTRUCTION ON ACCOMPLICE LIABILITY, INCLUDING THE OMISSION OF AN EXPLANATION THAT AN ACCOMPLICE MIGHT HAVE A LESS CULPABLE MENTAL STATE THAN A PRINCIPAL, VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

POINT II

THE GENOCIDAL RACIST MATERIAL SEIZED FROM DEFENDANT'S BEDROOM FIVE MONTHS PRIOR TO THE INCIDENT SHOULD HAVE BEEN EXCLUDED SINCE IT DID NOT FALL WITHIN ANY EXCEPTION REGARDING EXCLUSION OF PRIOR BAD–ACTS EVIDENCE AND WAS FAR MORE PREJUDICIAL THAN PROBATIVE.

POINT III

THE GENOCIDAL ANTI–SEMITIC AND OTHER HATE MATERIAL SEIZED FROM DEFENDANT'S BEDROOM FIVE MONTHS PRIOR TO THE INCIDENT SHOULD HAVE BEEN EXCLUDED SINCE IT DID NOT FALL WITHIN ANY EXCEPTION REGARDING EXCLUSION OF PRIOR BAD ACTS EVIDENCE AND WAS FAR MORE PREJUDICIAL THAN PROBATIVE.

POINT IV

THE TRIAL COURT'S INSTRUCTION CONCERNING THE USE OF THE OTHER BAD–ACT EVIDENCE WAS INADEQUATE AND DENIED DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL. (Not Raised Below).

POINT V

THE MATERIAL OBTAINED FROM DEFENDANT'S BEDROOM IN HIS ABSENCE WAS IMPROPERLY ADMITTED INTO EVIDENCE SINCE IT WAS THE PRODUCT OF A WARRANTLESS AND NONCONSENSUAL SEARCH.

POINT VI

THE TRIAL COURT'S INSTRUCTION REGARDING THE JURY'S OBLIGATION TO ASSESS THE CREDIBILITY OF "A CERTAIN STATEMENT ALLEGED TO HAVE BEEN MADE BY THE DEFENDANT" ERRONEOUSLY OMITTED ANY REFERENCE TO THE CREDIBILITY OF THE MULTIPLE WRITTEN STATEMENTS SEIZED BY POLICE AS WELL AS THE VARIOUS ALLEGED ADMISSIONS MADE BY DEFENDANT TO FIVE DIFFERENT PERSONS, THEREBY DEPRIVING DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL. (Not Raised Below).

*POINT VII*
 THE ACCUMULATION OF ERRORS DENIED DEFENDANT DUE PRO-
 CESS OF LAW AND A FAIR TRIAL.

During the morning of February 4, 1993, Detectives Michael
Quigley and James A. Frohner of the Egg Harbor Township
Police Department went to the trailer home where the twenty-
year-old defendant lived with his mother and his step-father.
Defendant was not home, but his mother invited the officers in
and insisted that they take a look at his bedroom. The bedroom
door was off of its hinges and the room was in disarray. The
officers observed certain writings in the room. They left and then
returned at about noon to take notes. Quigley eventually left the
trailer and applied for and was granted a search warrant. Pursu-
ant to the warrant, at approximately 5:00 p.m., Quigley, Frohner,
and others collected various items from the bedroom, and Frohner
took photographs. The evidence seized included writings and
drawings demonstrating defendant's racial and anti-Semitic beliefs
and affiliations. More details concerning the events of February
4, 1993 will follow.

On July 13, 1993, five months after this evidence was seized,
Roy Dick, an African American man in his seventies, was brutally
beaten in Atlantic City. He died of his injuries on July 19, 1993,
without regaining consciousness. He was a frail man, about five
feet, two inches tall, who spent much of his time cleaning up the
streets and parking lots. He could not walk very well and was
hunched-over, moving only a half an inch at a time. He used
canes and an old broom. He wore hats and old long coats, even in
the summer.

Defendant's friends and acquaintances explained that during the
Summer of 1993, defendant had strong beliefs about various
groups of people. A friend of defendant's since high school
recalled that defendant shaved his head to be a part of the
skinhead faith. The friend said defendant had mixed feelings
about actually being a skinhead, but "he acted the faith," and
expressed strong feelings about black, Jewish, and Puerto Rican
people. Defendant had a tattoo that said "white" on his right

wrist and one that said "power" on his left wrist. He wore black combat boots with red laces to symbolize neo-Nazi beliefs.

During the Summer of 1993, Tabitha Buntele, then seventeen years old, lived with her mother in the same trailer park where defendant resided with his mother and step-father. She was five feet, four inches tall and weighed about one hundred pounds. At that time, she and defendant, who was twenty years old, were friends. Buntele was with defendant on the night of July 12, 1993, and into the morning of July 13, 1993. They decided to go to the Chelsea Pub in Atlantic City, as defendant used to work there and knew a lot of people. Sometime after midnight, Buntele drove the two of them to the Pub in her mother's car, a gray 1987 Reliant K. They parked in the rear of the parking lot near the bushes. While at the Pub, they drank and played pool. Buntele estimated she had two or three "nuclear kamikazes." She said defendant was drinking beer, but she did not remember how many he had.

The Pub's bartender recalled seeing defendant and a girl at the bar during the early morning hours, but said that defendant did not want anything to drink. He estimated that the couple was in the bar for about fifteen to twenty minutes sometime between 3:30 a.m. and 4:30 a.m.

Buntele recounted that when they left the Pub, they walked a couple of blocks to the Trop World Hotel Casino because defendant wanted to talk to one of their mutual friends who worked there. During the walk, defendant did not appear to be drunk. They spoke to the friend and agreed to pick him up at a bar and grill, two blocks from Trop World, when he got off of work at 8:00 a.m. According to the friend, defendant did not appear to be drunk or under the influence of alcohol. Buntele and defendant walked back to the car which was still parked at the Pub.

Buntele recalled that before getting into the car, defendant said that he needed to urinate and went behind some bushes. She saw a small, skinny black man wearing a long trench coat near those bushes, and opined that he was "a bum." She saw defendant swing his hand at the man "[l]ike he was throwing something,"

and tell him "to get lost." Defendant was a foot or two away from the man, within arm's reach, but she could not tell whether defendant actually hit the man. The man walked off a couple of feet through an opening in the bushes and defendant followed. Buntele was not able to see what the men were doing and could not hear anything. She did not see or hear anyone else in the area. About a minute later, defendant came from the bushes and said: "get in the car. Let's go." Once in the car, he told her, "I think I just beat somebody up." They left the parking lot and went to a McDonald's by the bus station. After getting something to eat at the drive-through window, they drove back to Egg Harbor Township. During the morning, defendant told Buntele that he kicked the man once or twice.

During the early morning hours of July 13, 1993, a woman who lived at 17 South Chelsea Avenue was awakened by the sound of a lady repeatedly screaming, "no." She looked out the window and saw a white male getting into the driver's side of a car which was parked in the parking lot of the Pub. The woman described the car as light in color and having a box shape. At trial, she was shown a photograph which she identified as the car she had seen that morning. She said that a woman was seated in the passenger's seat. She went back to bed and a few minutes later, she heard police vehicles. She looked out and saw police officers and ambulance personnel assisting an individual on the other side of the fence. On cross-examination, she acknowledged that she had described the white man as being in his early thirties and of average build. She explained that she was looking at the top of his head from her second story window and she guessed his age because he was not an old person and was at least of driving age.

Another resident of the second floor of the same rooming house testified that at 4:34 a.m. on July 13, 1993, he heard someone say in a loud voice, "come on." The noise was coming from the direction of the parking lot of the Pub. He looked out of the window, but did not see anything so he went and sat down. He then heard a real loud crack like someone was hit with a stick.

He said it was not a regular sound. He went back to the window, and saw a girl and a guy run and jump into a gray, K car. From a photograph at trial, he identified the gray car he had seen that morning. He also said the female got into the passenger's seat, explaining the male was the last to come out of the yard and he went around the back and got into the driver's side. The witness went out onto his fire escape and saw someone lying down in the yard trying to sit up. He went down and saw it was Dick. Dick was moaning and his face was "all puffed out" with blood coming from it.

The witness went to Pacific Avenue where he flagged-down a police car. The officer followed the witness to the parking lot, and found Dick injured about the face with a lot of blood coming out of his mouth and around his nose. There were a couple of canes and a hat near Dick.

The witness described the two perpetrators as being white and having blond hair. The female "had something big in her hair, like a ribbon or something" which was pink. The male was "pretty tall," about six feet, and "biggish," and the girl was "kind of short" in comparison with him, about five feet, six inches. The male was wearing a light-colored or white T-shirt. On cross-examination, he acknowledged that he had said that the male appeared to be in his mid-twenties.

At 5:07 a.m., the paramedics transported Dick to Atlantic City Medical Center. He arrived at the hospital in a comatose state. He had a collapsed left lung, multiple fractures of the bones of the mid-face, and fractures of the walls of the maxillary sinus on either side of the nose, so severe that "they were almost unrecognizable." The nasal bones and the part of the nose that extends backwards and lies beneath the brain were also fractured. There were also fractures of the zygoma bone which runs along the cheek and of both orbits around the eyes. His sternum and four ribs were fractured, and he had extensive hemorrhaging of his right arm indicative of at least three blows. He was unable to survive these injuries.

Later on the morning of July 13, 1993, Buntele went to defendant's house to awaken him to go to Atlantic City to pick up their

mutual friend from work. Defendant stopped at the Pub and walked into the bushes for a couple of seconds. When he came back into the car, he told Buntele that he found medical examiner's gloves there.

Defendant's longtime friend recounted that on the day after the incident, defendant showed him a newspaper account of Dick's beating and said that the article was about him, as the previous evening he "beat up some old guy" near the Pub on Chelsea Avenue. Defendant was "kind of hyper" and somewhat exuberant about the incident, stating that the man was black and referring to him as an "old dirty man" and a bum who looked like "a scum." Defendant said that the man had swatted his cane in defendant's direction, but had not struck him. Defendant said he hit the man in the back of the head as the man walked past him and that when the "old guy" fell down, he "[s]tarted kicking and stomping him." He said Buntele cheered him on. Two of defendant's friends were also present during this conversation.

Detective Carl Rando of the Atlantic City Police Department received a phone call from Buntele's boyfriend at approximately 2:00 a.m. on July 16, 1993. As a result of that call, he and Detective Gasparo drove to the trailer park where defendant lived in Egg Harbor Township at approximately 3:30 a.m. They observed a gray 1987 Reliant K car there and noted the license plate number. They next saw three people getting into the K car, a female and two males. Two of these people fit the descriptions given, so the detectives followed the vehicle and eventually stopped it. The three were transported in separate cars to an office of the Atlantic County Prosecutor for questioning.

On July 16, 1993, Sergeants Anthony Porcelli and Raymond Bolis, of the homicide unit of the prosecutor's office, met with defendant who was incarcerated. Bolis advised defendant of his *Miranda*[1] rights, and at 9:53 a.m., defendant signed a *Miranda*

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

form, waiving his rights and agreeing to speak to the officers. Initially, defendant denied he had any altercation with an older man in Atlantic City. However, at approximately 10:30 a.m., he told the officers that he left the Chelsea Pub and walked to the rear of the property through a fence to relieve himself, when an older man came up to him and swung a cane at him. He noted that he was not hit by the cane. Defendant admitted he struck the man in the head and face area with his fist at least two times, causing the man to fall to the ground. Defendant said that he was with a female, but that she was sitting in the car and had nothing to do with the assault.

At 11:30 a.m., in a taped statement, defendant said he had initially denied there was any altercation because he was afraid of going to jail. He continued that at 10:00 p.m. on July 12, 1993, Buntele picked him up in her mother's car at the 1400 Bar in Egg Harbor Township and they went to the Chelsea Pub, arriving at 10:30 p.m. Defendant said he had two or three beers in the 1400 Bar and about three beers in the Pub.

According to defendant, they left the Pub and walked to Trop World to talk to a friend who worked there. After about ten minutes, they returned to the Pub parking lot. Defendant went to urinate out by the back fence. He went through a cut in the fence into the rear yard of a green house. He said a dark-skinned older man approached him and swung a cane. Defendant grabbed the cane and hit the man in the face. Defendant "possibly" hit the man again. The man fell down and did not get up. Defendant then got in the car and told Buntele that he had "hit somebody" and they had to leave. Buntele drove them to the Trump Plaza parking garage, and they went for a walk on the boardwalk for about a half-hour, before going to McDonald's.

Defendant told the officers that he went back to the area of the Pub at 8:00 a.m. because he wanted to see if "the guy was alright." The man was gone and defendant "thought he left." Defendant said he did not mean to do it and did not want to hurt the man.

Detective Bolis testified that Dick was found in the very spot where defendant admitted that he had hit an older man.

Defendant was held at the County Jail in Mays Landing, where Arthur Thomas, an African American prison inmate, claimed to have spoken to defendant on July 16 or 17, 1993. Defendant allegedly told Thomas he was a skinhead and did not like blacks, Puerto Ricans, Hispanics, and Jews. Defendant told Thomas he went into the bushes to urinate, and an old man had raised his cane to him. As a result, he kicked and beat the old man, who he referred to as scum. Then, the girl he was with went through the man's pockets. Defendant said he did not "leave the guy for dead" like the newspapers were saying. Thomas claimed defendant said his parents were going to pay off Buntele to testify on defendant's behalf and that he was going to "play like" he was "crazy" to get away with the crime. Thomas allegedly witnessed defendant demonstrating to another inmate how he had stomped, punched, and kicked the old man. Thomas lent defendant his white shoe laces so he did not have to go to court wearing his red shoe strings which symbolized Nazism.

Thomas also indicated that in June 1993, before the attack on Dick, Thomas and defendant were housed together in the same jail for a couple of days. According to Thomas, defendant, who had a shaved head at the time, put Nazi signs on the walls and on his desk. Thomas had an extensive criminal record and acknowledged that the assistant prosecutor had written a letter to the Parole Board advising that Thomas had been cooperating in defendant's case.

After Dick's death, on July 19, 1993, defendant was charged with murder. The next day, Detective Burke went to the Atlantic County Justice Facility to advise defendant. Defendant then told Burke he "may have hit the guy more than twice." Burke advised defendant of his constitutional rights. Defendant said he was willing to waive his rights and speak to Burke and then told Burke that Buntele was not involved and that she stayed near the car. Defendant also said he did not take anything from the victim.

A girlfriend of the defendant testified that he called her from jail twice and on the second occasion, told her he had kicked a black bum in the head when he and Buntele had gone to Atlantic City looking for black bums to beat up. She further stated that before receiving these calls, she saw Buntele in Absecon, and Buntele bragged that she was involved in the assault and "did most of it," and was the one kicking Dick in the head.

According to Buntele, she and defendant had been no more than friends up until the point that they were brought to the prosecutor's office on July 16, 1993. After that, they became boyfriend and girlfriend. This was defendant's idea, and they wrote letters to each other almost every day and spoke on the telephone. She also visited defendant in jail, and by October 1993, they were planning to get married, and she began using the surname Crumb. Defendant did not want her to testify as a State's witness and suggested she say she was drunk or high when she gave the statement on July 16, 1993. He also suggested they claim they left the Pub at 2:30 a.m. She broke their engagement because defendant became possessive, calling her constantly at home and at work, insisting that she visit him all of the time, and not allowing her to talk to her friends.

Defendant did not testify, but several character witnesses testified that he was not violent. Defendant's friend of four years said he observed defendant in the company of a black friend quite often and that defendant had several Jewish friends. The witness acknowledged that defendant would occasionally tell Jewish jokes, but he never said any racial slurs, and he never heard defendant use "the N word." He was aware that defendant was interested in Adolph Hitler and neo-Nazism, and admitted he had seen him with a shaved head wearing black boots with red laces, and knew the significance of such attire.

I

Defendant first contends that the judge's failure to give a jury instruction on accomplice liability on count one, murder, violated

defendant's rights to due process and a fair trial. He asserts the trial judge should have instructed the jury that an accomplice might have a less culpable mental state than a principal. Defendant's appellate counsel refers to Buntele's possible involvement in the attack and suggests that defendant may have been attempting to protect Buntele by denying to the police that she had any involvement in the incident. Therefore, defendant's counsel argues that it was the judge's obligation to give such a charge, *sua sponte,* even if it was inconsistent with the defense theory and was not requested. Defendant cites *State v. Powell,* 84 *N.J.* 305, 318–19, 419 *A.*2d 406 (1980) and *State v. Ramseur,* 106 *N.J.* 123, 270 n. 62, 524 *A.*2d 188 (1987).

We recognize that in a murder case, the judge has an obligation to charge the applicable law to the jury even when not requested. *State v. Powell, supra,* 84 *N.J.* at 318, 419 *A.*2d 406. Here, however, an accomplice liability charge was not required.

*N.J.S.A.* 2C:2–6 provides in pertinent part:

c. A person is an accomplice of another person in the commission of an offense if:

(1) With the purpose of promoting or facilitating the commission of the offense; he

(a) Solicits such other person to commit it;

(b) Aids or agrees or attempts to aid such other person in planning or committing it[.]

Where a defendant is charged as an accomplice, the trial judge must instruct the jury that to find defendant guilty of a crime under a theory of accomplice liability, it must find that he or she "shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." *State v. Fair,* 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965). Furthermore, the charge must equally relate those principles to the degrees of the offense involved. *State v. Weeks,* 107 *N.J.* 396, 405, 526 *A.*2d 1077 (1987). In other words, when an alleged accomplice is charged with a different degree offense than the principal or when lesser included offenses are submitted to the jury, the trial judge has a duty to "carefully impart[ ] to the jury the distinctions

between the specific intent required for the grades of the offense." *Id.* at 410, 526 *A.*2d 1077.

 Needless to say, the obligation to provide the jury with instructions regarding accomplice liability arises only in situations where the evidence will support a conviction based on the theory that a defendant acted as an accomplice. *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 527, 632 *A.*2d 277 (App.Div.1993). In this case, the prosecution's theory was that defendant alone attacked Dick. That is clear from the prosecutor's opening and closing statements and the State's admission into evidence of defendant's statement in which he maintained that Buntele was sitting in the car and had nothing to do with the assault. Furthermore, the indictment charged defendant with purposely or knowingly inflicting serious bodily injury to Dick resulting in his death. It did not charge that defendant was an accomplice.

The defense theory was that someone other than defendant and Buntele committed the murder. Defense counsel cross-examined the bartender regarding his telling the police that he had seen another couple in the Pub that night. Defense counsel emphasized this point in summation and pointed out the inconsistencies between how the neighbors who had seen the couple in the parking lot described the man and woman and how defendant and Buntele claimed to dress and look that night. Defendant's attorney argued that the person who defendant admittedly hit once or twice was not Dick.

Neither the State's version of what occurred nor the defense's version of what occurred warranted a *Bielkiewicz* charge. Under the State's theory, defendant was culpable as a principal, and under the defense's theory, defendant was not involved in the murder of Dick. Nonetheless, defendant suggests that a *Bielkiewicz* charge was required for the scenario which was "indicated" by the record that Buntele was the principal and defendant was an accomplice. We reject this contention. Even if Buntele was involved in the attack, once defendant was identified as a participant in the beating of Dick, there was no evidence from which the

jury could have differentiated between his culpability and that of Buntele. *State v. Rue,* 296 *N.J.Super.* 108, 116, 686 *A.*2d 348 (App.Div.1996), *certif. denied,* 148 *N.J.* 463, 690 *A.*2d 611 (1997). Moreover, as the State points out, defendant was not prejudiced because the jury was given the opportunity under the jury instruction to assess his precise culpability and find him guilty of murder, passion/provocation manslaughter, aggravated manslaughter, reckless manslaughter, aggravated assault, or simple assault.

Defendant argues that an accomplice liability charge was necessary particularly in light of the prosecutor's alleged misstatement of the law in her summation:

So if you have a distraction in your mind about Tabitha Buntele's responsibility for any of this, put it aside. She's not on trial. *And even if she had done something, that doesn't take any responsibility away from him, nothing.*

[Emphasis added.]

Defendant asserts that in the emphasized portion of that quote, the prosecutor misstated a key element of accomplice liability. We disagree. The prosecutor did not suggest that an accomplice is guilty of the same degree offense as the principal. Rather, the prosecutor suggested that if Buntele was an accomplice, defendant would be no less responsible for his acts as the principal actor.

In light of defendant's failure to request such a charge at trial, any error must be disregarded by this court unless it was clearly capable of producing an unjust result. *R.* 2:10–2; *State v. Cofield,* 127 *N.J.* 328, 341, 605 *A.*2d 230 (1992). Here, the omission of an accomplice liability charge was not error at all, let alone plain error capable of producing an unjust result. There was no rational basis for an accomplice liability charge. Such a charge would have prejudiced defendant and also tended to detract from his theory of defense.

II

Defendant next contends that at trial, the judge erred in refusing to exclude from evidence the genocidal racist material seized from defendant's bedroom five months *before* the attack on

Dick. Earlier, the judge had, on May 5 and 12, 1994, conducted a hearing on defendant's motion to suppress items seized as a result of the search with a warrant of defendant's bedroom on February 4, 1993. The judge determined that the racist and anti-Semitic material seized from defendant's bedroom should be excluded because it was inflammatory and the risk of undue prejudice substantially outweighed the material's probative value as to defendant's motive.

The State filed an interlocutory appeal, and we concluded that the trial court had abused its discretion. *State v. Crumb,* 277 *N.J.Super.* 311, 316, 649 *A.2d* 879 (App.Div.1994). We held that the probative value of written material expressing defendant's hatred of blacks was not outweighed by danger of unfair prejudice, and that the admissibility of the remaining anti-Semitic materials should be determined at trial. *Id.* at 319–20, 649 *A.2d* 879.

Defendant's mother, Sharon Crumb, testified at the May 1994 hearing that in February 1993, she lived with her husband and defendant at the Karl Le Trailer Park. According to his mother, defendant's bedroom was apparently ten feet by eight feet or ten feet, and contained a couch, two bureaus, a night table, a mirror, and a closet. Kalin, who is Sharon's sister and defendant's aunt, lived in the same trailer park and stored clothes in the closet in defendant's room.

The trailer home was in Sharon's and her husband's names. Defendant's mother claimed he paid rent to her according to an arrangement wherein defendant would babysit for Kalin's children for $30 or $40 per week and defendant or Kalin would give her half of that money. She said defendant was responsible for cleaning his own room, and that in the Summer of 1992, she and defendant had a fight because she had entered his bedroom and cleaned it without his permission. As a result, she was not allowed access to his bedroom without first asking his permission. She explained that the hinges at the top of the door were bending off so her husband removed the door.

The mother testified that Detectives Quigley and Frohner of the Egg Harbor Township Police Department came to her trailer on February 4, 1993. She had known Quigley for two or three years, had dealt with him about three or four times, and had previously called him for help because she was concerned about the people defendant was "hanging out" with.

On February 4, 1993, Quigley and Frohner advised the mother that they wanted to ask her son a few questions. She told them that he was not home, but invited them in. The officers asked what defendant had been up to, and she responded, "I don't know, go look, go look at his room." She said the officers did not ask to look at the room. The room was a mess, and she wanted them to see that defendant "wasn't in his right mind at the time." He had previously written "go to hell" on the mirror which she washed off. She was concerned because defendant's friends were involved in satanic activities. She wanted Quigley to know that defendant needed help and that she was not making up that defendant was involved in satanic activities. On a previous occasion, she had explained to Quigley and others that defendant and his friends had an altar at a slaughterhouse where they congregated, but they did not believe her.

The mother said the officers went right into defendant's bedroom, and after they had been in there for ten minutes, she looked in and saw them going through defendant's drawers, looking at papers. She said Quigley had his hand in the night table drawer and the other officer was looking in a bureau drawer. She said she went into the living room and cried because she did not think that the officers had a right to do what they were doing. She did not ask the officers to stop because she was afraid and intimidated, and did not know that she could. She was not presented with a consent to search form nor did the officers tell her that she had a right to refuse to let them search.

She asserted that when the detectives had been in defendant's room for a half-hour, Quigley came out and asked if defendant had given her permission to go into his bedroom or to open his night

table drawer. She told him no, but said she went in anyway. Quigley said he had found some papers about Jews and that he needed to make a phone call to see if he could take them. He then left the trailer to make the call, and the other officer remained in defendant's bedroom. Quigley returned five or ten minutes later and told her he would be back with a search warrant. He went into defendant's bedroom where he and the other officer remained for another forty minutes. At approximately 11:30 a.m., they left, saying they would be coming back with a search warrant. After they left, she opened the drawer to defendant's night table and saw three papers neatly piled. She took the papers and drove to Kalin's trailer. However, the two returned to the mother's and put the papers back in the drawer. Frohner returned at about 3:00 p.m. and took pictures of the bedroom. He sat with the mother and her sister until the search warrant arrived after 5:00 p.m. The officers then seized items from defendant's bedroom.

On cross-examination, the mother was shown pictures which depicted what her son's room looked like on February 4, 1993. She acknowledged that there were "[m]aybe some papers on the floor" and that writings on the wall included, "ACS" [Atlantic City Skinheads], "white power," and a satanic drawing of a person with a sickle, and swastikas.

Quigley testified that he had known defendant since he was fourteen or fifteen years old, and that defendant's mother had contacted him for help and advice in dealing with defendant. He testified that on the morning of February 4, 1993, he and Frohner went to the trailer to investigate allegations of two victims who had identified defendant as the perpetrator in two separate sexual assaults. The second victim had reported the assault to police on February 1, 1993. Quigley went to the trailer to discuss the allegations with defendant, not to search.

According to Quigley, defendant's mother answered the door and said that her son was not home and had not come home the night before. She said she was very concerned, as she feared he

was getting more deeply involved in the skinhead movement and satanism. In the living room were twenty-five to fifty copies of a pamphlet which listed the names and addresses of different affiliations of the KKK and white power groups. The mother gave Quigley a copy. She wanted Quigley "to take a look at" her son's bedroom so he could see what defendant had done to his room in the five years that they had lived in the trailer home. It was her idea that the officers go into the bedroom and he had asked if she had free access to defendant's room, if defendant paid rent, and whether the door was locked. She replied that she did have access, and complained that defendant did not pay rent because he did not work, and he did not clean his room. Before entering the room, Quigley said: "[y]ou know, Mrs. Crumb, before we go in the room, I want to advise you we are investigating Chris for two aggravated sexual assaults." She replied that she understood that and told the officers to "go in the room if you like." Quigley was satisfied that she had authority to let them go into the room.

The room was a mess with clothes and papers all over the place. Quigley said they did not go in the drawers to either the night stand or the dressers. There were papers on top of the bureau, on the couch, and on the floor. Quigley saw on the couch a drawing of a female, with her legs spread, which said, "Kristine Kapinski," and "[p]lease do not rape me." Kapinski was the victim of the first sexual assault. Frohner found another paper which appeared to portray a planned burglary of Weed's Texaco station on Black Horse Pike in McKey City. A third document on the couch referenced an abandoned building known as the slaughterhouse which had been set on fire.

Quigley believed that these three papers were evidence of crimes. At about 12:00 noon, he left and drove to a pay phone to call his supervisor, while Frohner remained at the trailer. The captain advised Quigley not to remove anything from the bedroom but to write down anything that was of evidential value. Quigley returned to the trailer home to take notes of the three items they had seen. Although he believed that he had cause to search the

room based on the three documents found in plain view, he thought it would be best to obtain a search warrant. He acknowledged he did not tell the mother she had the right to refuse to allow the officers to look in the room. He said he was in the room for only five minutes before he left to make the call and five minutes after he made the call. He then left to get a search warrant. Frohner left with him, but went back to the trailer in case defendant returned. Quigley did not take anything with him, but listed the three documents seen in the bedroom in his affidavit for the search warrant, which was issued at 5:15 p.m. Quigley returned to the trailer with the warrant and confiscated the three documents and other items which were evidence of the sexual assault cases. Defendant was charged with the crimes later that night.

Frohner's testimony at the suppression hearing regarding what occurred on February 4, 1993, was consistent with Quigley's. Frohner stated that when Quigley went for the search warrant, he waited for a few hours with both women and he watched television and read a book. Eventually he received a call on his cellular telephone informing him that a judge had issued a warrant. At that point, Frohner went back into the bedroom and took photographs. Quigley and two other men from the Prosecutor's Office arrived and a search was conducted of the bedroom. Nine items were seized: (1) assorted hand bills; (2) a black ring binder; (3) assorted papers from the night stand; (4) a box cutter from the night stand; (5) a pillow case; (6) assorted papers from the clothes hamper; (7) assorted papers from the top of the dresser; (8) a paperback book entitled, *Satan Wants You,* and assorted papers from the closet; and (9) two letters from the door.

Following the testimony, defense counsel conceded that the search warrant was sufficient on its face. However, counsel argued that the information in the warrant was based on an illegal search because there was no consent, as defendant's mother did not have the legal capability to consent to a search of her adult son's bedroom.

The judge in an oral decision found that when the officers initially went into the room, it was at the insistence of defendant's mother and that they saw in plain view three papers which appeared to be evidence of crimes. Based on these findings, the judge denied defendant's motion to suppress the evidence. However, he ruled that the evidence seized from defendant's bedroom, such as the writings and drawings which suggested defendant's racist and anti-Semitic beliefs and affiliations, would not be admissible in the State's case in chief because it was inflammatory and the risk of undue prejudice substantially outweighed the material's probative value regarding defendant's motive. Since the material would be admissible in prosecuting the bias crime, the court severed the third count for a separate trial.

We granted leave to the State to appeal from that pre-trial order and, in a decision published on November 22, 1994, reversed that part of the order excluding the written material. *State v. Crumb, supra,* 277 *N.J.Super.* at 322, 649 *A.*2d 879. We affirmed that part of the order severing the third count. *Id.* at 321, 649 *A.*2d 879.

In our opinion, we called for some caution as to the admissibility of the material. *Ibid.* We recognized that the record developed at trial could differ substantially from the record developed on the suppression motion, and therefore, ruled that the trial judge "must be sensitive to any significant differences between the record on this appeal and what occurs at trial and the impact of those differences on issues of relevance and undue prejudice, even with regard to the material calling for the deaths of blacks." *Ibid.*

As to the written material that did not specifically mention black people, we concluded that the trial judge should not have excluded it in a pre-trial ruling and instead should have awaited its offer during the context of the trial. *Id.* at 320, 649 *A.*2d 879. Although this evidence did not expressly refer to black people, we indicated it had probative value because it showed defendant's commitment to theories of racial superiority, and "tend[ed] to reinforce and give context to defendant's expressions of hostility

toward blacks." *Ibid.* If offered in the State's case, the trial judge would have to evaluate its probative value and the risk of undue prejudice pursuant to *N.J.R.E.* 403. *Id.* at 320–21, 649 *A.*2d 879.

At trial, the judge, over defense counsel's objections, allowed into evidence photographs of defendant's bedroom taken by Frohner. One depicted writings on the wall, stating "ACS," "white power," "under siege," and "fade to black," and a swastika and a symbol of a round circle with an X or a T through it. Another showed various papers strewn about the room and soda bottles and dirty glasses. Also admitted was a writing of a circle with a star in it attached to a door which was off of the hinges, as well as posters of Motley Crue, Megadeth, and Metallica.

Quigley testified about several items removed from defendant's bedroom, which defendant had confirmed at an interview at police headquarters were materials he had written. Toward the beginning of Quigley's testimony about defendant's writings, the judge interjected and instructed the jury that it must not convict defendant because of his beliefs and that it should consider this material only as evidence of defendant's state of mind at the time of the incident.

Several items were then entered into evidence: 1) A black loose leaf notebook with a drawing on the cover of an individual resembling Adolph Hitler with a circle and a star and a snake with the words along the side, "Adolph Hitler was definitely ahead of his time. Long live the Skin Heads, CJ, CJ;" 2) A page of a spiral notebook on which was written "American Skin Heads" and "Neo–Nazi," with a picture of a swastika and someone saying, "get him" with an arrow pointing to the person and the words "white power" and an emblem of a Celtic cross in a circle in which was the phrase "kill them fucking niggers," and underneath the symbol was written "Kill them dead. Kill 'em all. White Power;" 3) A blow-up of a writing, stating "Nazi pretty boys," a swastika, and then "American Skin Heads," and then below that was a circle with a cross with the words, "kill them fucking niggers," and "white power" and a page containing writings about tattoos includ-

ing "right hand white with banner," and "left hand power with banner;" 4) A drawing of a circle and cross and the words, "kill 'em, kill 'em dead. Kill 'em all," and "white power."

After these four items had been admitted, defense counsel objected to the admission of a blow-up of a writing saying "SS" at the top and "Sig Heil" in the middle. Below the writing was a drawing of a dark-skinned individual saying "can't we just get along," and a second individual saying, "die nigger scum," and below the picture it said, "Rodney King beating." The judge remarked that the evidence was getting cumulative, but admitted it. A blow-up of another page was also admitted. On the top of it was written "great ideas" and then the initials "FOMA," with the words underneath each corresponding letter: "death for *f* ree," "[t]hey *o* we," and "*m* inority." (Emphasis added.) It was unclear what was written underneath the "A." Also on that page was written, "MFA," for "Minority Free America," and descriptions of clothing including black combat boots with red laces.

At that juncture, the judge indicated that he would not permit anymore evidence of this type "unless it really says or shows something substantially different than what you have already shown there." The jury was excused and the prosecutor made a proffer outside of the presence of the jury. The judge refused to admit several items offered, but did agree to admit a page from the notebook stating, "Adolph Hitler," "I totally agree on all of his thoughts," and "his attitude toward the minorities and views was [sic] about the same. I would have done it if I had the power."

The judge also admitted an August 31, 1992, entry in defendant's notebook stating, "I am going to be a Skin Head really soon," and a portion of a letter stating:

I'm still with Atlantic City Skin Heads. I went to the extreme, shaved my head and got my Dr. Martin boots, my black bomber jacket, more tatoos [sic]. Got a few skulls on my lower left arm, a Celtic cross on my upper left arm, on my upper right arm I got a Viking grim reaper, stillman, and then inverted cross and white power across my wrist.

The judge admitted the words to a song, entitled "Hatred Inside," by Megadeth which defendant wrote in a notebook:

Welcome to this F'd up world where you will live and die. There are no ways to change the hatred that I feel inside. They're trying to kill us one by one and we're doing nothing to stop them. You should listen to what I say before you become a victim.

[W]e should join together in unity and help to destroy them all. United we stand, divided we fall. They run the streets and our lands like it is their own, robbing our men and raping our women and stealing from our homes.

. . . .

Then they deserve to die, all of them, for being on this earth. They should have killed all of them at their f'g birth.

Defendant argues that we are not bound by our earlier decision in *Crumb, supra,* since the law of the case doctrine is discretionary and not irrevocably binding. In any event, we find no reason to disagree with that earlier decision. This court has already decided, in a well-reasoned published opinion, that the subject material was admissible.

We will assume for purposes of our discussion that both *N.J.R.E.* 404(b) and *N.J.R.E.* 403 are implicated in determining the admissibility of the evidence objected to. The material seized from defendant's bedroom, which was admittedly written by him, may arguably be considered "[e]vidence of other crimes, wrongs, or acts" within the meaning of *N.J.R.E.* 404(b). Although defendant's writings are constitutionally protected free expressions of his racial beliefs and are not themselves unlawful, they nonetheless may be interpreted by a jury to constitute other wrongs or acts. Although evidence excluded under *N.J.R.E.* 404(b) is often referred to as "other crime evidence," the rule also excludes evidence of other wrongs and acts which may not necessarily be unlawful. Richard J. Biunno, *Current N.J. Rules of Evidence,* comment 7 on *N.J.R.E.* 404 (1997–1998); *See State v. Kittrell,* 279 *N.J.Super.* 225, 237–38, 652 *A.*2d 732 (App.Div.), *certif. granted,* 142 *N.J.* 573, 667 *A.*2d 190 (1995) (considering admissibility of evidence under *N.J.R.E.* 404(b) that suspect arrested on CDS charges had a beeper on his possession).

In the recent case of *State v. Nance,* 148 *N.J.* 376, 689 *A.*2d 1351 (1997), our Supreme Court held that evidence of prior jealous

episodes by the defendant toward his former girlfriend was admissible to show his motive in shooting her male friend. *Id.* at 382–84, 386, 689 *A.*2d 1351. Similarly, here, evidence of defendant's prior writings demonstrating his racial hatred was admissible to show his motive in beating Dick.

Of course, even if the material seized from defendant's bedroom regarding his racist beliefs was admissible under *N.J.R.E.* 404(b) to prove motive, the trial judge may in his discretion exclude it under *N.J.R.E.* 403, if its probative value is outweighed by its prejudicial impact. A four-part test is used for determining when extrinsic evidence of other crimes or wrongs is admissible:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*State v. Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230.]

Determinations of the admissibility of "other crimes, wrongs, or acts" evidence are left to the discretion of the trial court. *State v. Marrero,* 148 *N.J.* 469, 483, 691 *A.*2d 293 (1997); *State v. Nance, supra,* 148 *N.J.* at 387, 689 *A.*2d 1351. The trial judge's decision in this regard is entitled to deference and is to be reviewed under "an abuse of discretion standard." *Ibid.*

Under the first prong of the *Cofield* test, evidence of defendant's racist writings was relevant to the material issue of defendant's motive in attacking Dick. The State charged defendant with "purposely or knowingly" causing Dick's death. As noted in *State v. Crumb, supra,* the written material regarding defendant's hatred of and death wish for black people showed defendant's motive and state of mind. 277 *N.J.Super.* at 317–18, 649 *A.*2d 879. Defendant's state of mind was a relevant issue because "[w]ithout it, a jury would not know the context of Roy Dick's death and might be resistant to the idea that a young man purposely would

inflict deadly harm on an elderly stranger without any apparent reason such as theft or substantial provocation." *Id.* at 318, 649 *A.*2d 879.

Defendant argues on appeal that the prior bad acts evidence about his hatred of blacks was "global in nature" and "far removed" from any specific motive at the time of the attack. Defendant argues that the motive evidence must have a more specific link to the particular crime. *State v. Nance, supra,* 148 *N.J.* at 382–84, 689 *A.*2d 1351 (prior jealous episodes by the defendant toward former girlfriend admissible to show motive in shooting her male friend); *State v. Baldwin,* 47 *N.J.* 379, 391, 221 *A.*2d 199, *cert. denied,* 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966) (evidence that the victim was going to testify against the defendant in a robbery trial admissible to show motive in killing the victim).

That the link in those cases may have been more specific does not mean it was erroneous here to admit the evidence to show motive. In *Crumb, supra,* we cited *United States v. Mills,* 704 *F.*2d 1553, 1558–59 (11th Cir.1983), *cert. denied,* 467 *U.S.* 1243, 104 *S.Ct.* 3517, 82 *L.Ed.*2d 825 (1984), wherein the court held that membership in an Aryan Brotherhood prison gang and letters defendant wrote describing the brotherhood's activities were admissible to show that he killed a fellow inmate as retribution for a wrong perpetrated on a brotherhood member in another prison. 277 *N.J.Super.* at 319–20, 649 *A.*2d 879. The defendant had tried to exclude the evidence under *F.R.E.* 404(b) as evidence of other crimes, wrongs or acts and under *F.R.E.* 403 as unduly prejudicial. 277 *N.J.Super.* at 319–20, 649 *A.*2d 879 (citing *United States v. Mills,* 704 *F.*2d 1553, 1558–59 (11th Cir.1983), *cert. denied,* 467 *U.S.* 1243, 104 *S.Ct.* 3517, 82 *L.Ed.*2d 825 (1984)). The Court of Appeals disagreed and ruled that the letter " 'pertained to a chain of events forming the context, nature and set-up of the crime,' and that the evidence was necessary '[t]o make the crime comprehensible to a jury.' " *Id.* at 320, 649 *A.*2d 879 (quoting *Mills, supra,* 704 *F.*2d at 1559).

We find that the same rationale applies here, as defendant's written materials supplied a motive for an otherwise incomprehensible crime. The motive was at first baffling since robbery was ruled out because Dick had over $100 in his possession when he arrived at the hospital. The other crimes evidence was necessary for the proof of motive. *State v. Marrero, supra,* 148 *N.J.* at 482, 691 *A.*2d 293 (citing *State v. Stevens,* 115 *N.J.* 289, 301, 558 *A.*2d 833 (1989)).

In *Crumb, supra,* we recognized that at the time of the interlocutory appeal, we could not consider all of the circumstances that occurred at trial and their impact on the issues of relevance and prejudice. 277 *N.J.Super.* at 321, 649 *A.*2d 879. Defendant argues that the actual trial was far more replete with evidence of defendant's hatred of blacks than the limited pre-trial record. However, on interlocutory appeal, we noted the extensive evidence of defendant's writings, which included such phrases, as "Die Nigger Scum," and "White is Right," "Kill them Fucking Niggers," and "White Power." *Id.* at 315–16, 649 *A.*2d 879. Nothing admitted at trial was any more inflammatory even considering the alleged cumulative nature of the evidence. We anticipated testimony of the nature admitted at trial from the witnesses as to defendant's racist views. We specifically stated that the written material corroborated "the anticipated testimony of Frolich and Thomas regarding defendant's race-related statements to them." *Id.* at 319, 649 *A.*2d 879.

Finally, still in regard to the first prong, defendant asserts that our earlier decision centered on the unrealized speculation that the written material would be relevant to the issue of self-defense. However, our decision that the written material should be admissible was not centered on the self-defense theory.

We provided three other reasons for the relevance of this evidence: (1) the written material provided "compellingly powerful evidence of a motive which helps to explain an otherwise inexplicable act of random violence"; (2) noting that defendant may be entitled to a jury instruction regarding lesser included offenses

such as aggravated and reckless manslaughter, we stated that the written material had substantial probative value to the State in establishing that defendant acted with the necessary culpability, "extreme indifference to human life," that distinguishes those two types of manslaughter; and (3) the written material belied the suggestion that defendant had a concern for the victim's well-being as he implied by having told police that he returned to the scene in the morning. *Id.* at 317–18, 649 *A.*2d 879. Regarding self-defense, we simply added that the material tended to cast doubt on defendant's self-serving statement that Dick initiated the confrontation by swinging his cane at defendant. *Id.* at 317, 649 *A.*2d 879. The material was relevant to defendant's credibility on the issue of the need to defend himself and to meet any claim of imperfect self-defense. *Id.* at 318, 649 *A.*2d 879.

As to the second prong, defendant argues that the material seized from his bedroom was neither similar in kind nor close in time to the incident. Again, defendant argues that the evidence showed only general hatred toward black people and others without a specific link to the incident. Defendant argues that this court in *Crumb* mistakenly relied on *State v. Carter*, 91 *N.J.* 86, 449 *A.*2d 1280 (1982), where there was evidence that the defendants had a relationship with the murdered black man's family which could cause them to retaliate by randomly killing others. *Crumb, supra,* 277 *N.J.Super.* at 319, 649 *A.*2d 879. Defendant further argues that defendant's writings were not similar to the incident. We find no merit to any of these arguments and have discussed them previously. *R.* 2:11–3(e)(2).

As defendant concedes that the third prong of the *Cofield* test has been satisfied, we need not comment. The fourth prong of the *Cofield* test was sufficiently discussed in *State v. Crumb, supra,* 277 *N.J.Super.* at 319, 649 *A.*2d 879. We recognized that the material was potentially inflammatory, but concluded that defendant's race hatred as expressed in that material was central to the case. *Ibid.* We remain persuaded that the probative value of the material expressing defendant's death wish for black people was

not outweighed by the risk of undue prejudice. *Id.* at 320, 649 A.2d 879. Although the State had several additional documents, the judge limited the admission of the evidence. Moreover, the judge gave a limiting instruction at the time that the evidence was being admitted and in his final charge to the jury. Thus, any undue prejudice was reduced significantly. *N.J.R.E.* 105; *State v. Nance, supra,* 148 *N.J.* at 386–87, 689 A.2d 1351. We conclude that the trial judge did not abuse his discretion in admitting into evidence the racist material seized from defendant's bedroom. *State v. Marrero, supra,* 148 *N.J.* at 483–84, 691 A.2d 293.

### III

Defendant further maintains that the trial court erred in refusing to exclude from evidence the genocidal anti-Semitic and other hate material seized from defendant's bedroom. He argues that this evidence did not fall within any exception to the rule of exclusion of prior bad acts evidence and was far more prejudicial than probative. At trial, defense counsel also objected to the admission of evidence of any Nazi-type items. The judge overruled this objection and allowed in evidence a drawing of Adolph Hitler with the words, "Adolph Hitler was definitely ahead of his time, long live the Skin Heads"; various writings referring to the skinhead organization and neo-Nazism; a picture of a swastika; a writing in a notebook stating, "Adolph Hitler," "I totally agree on all of his thoughts," and "his attitude toward the minorities and views was [sic] about the same. I would have done it if I had the power."

As previously stated in *Crumb, supra,* defendant's hatred of Jewish people was relevant and probative of defendant's motive for the random killing of Dick. 277 *N.J.Super.* at 320, 649 A.2d 879. We explained the connection:

> Although this material does not mention black people, it does have probative value in establishing defendant's commitment as a "skinhead" to racial confrontation and his adherence to theories of racial supremacy. Thus, it tends to reinforce and give context to defendant's expressions of hostility toward blacks, and would rebut any

expressed or implied suggestion that the written material referring to blacks was an isolated aberration.

[*Ibid.*]

This anti-Semitic material, like the racist material, was relevant to the issue of defendant's state of mind regarding hatred of certain groups of people. Thus, it also tended to show the reason for an otherwise inexplicable act.

Defendant further contends that the non-racist genocidal material was not close in time or similar in kind to the incident, arguing "some" of this material "may" have been written almost one year prior to the incident. However, there is no evidence to demonstrate that these writings were written a year before the incident. These writings were discovered in defendant's possession only five months before the incident and do not appear to have been remote in light of defendant's continuing conduct and attire.

Defendant also argues that the anti-Semitic writings and drawings, blown up ten times their original size for the jury's viewing, were unduly prejudicial. Referring to the anti-semitic material, we cautioned the trial court "to evaluate its probative value and the risk of undue prejudice under *N.J.R.E.* 403, in the circumstances of the case as they evolve at trial." *Id.* at 320–21, 649 *A.*2d 879. In response to counsel's objection at trial, the judge questioned why the items were blown up. The prosecutor explained that this was done to save time in passing them around to the jury and because most of them were pages attached in a spiral notebook which could not be easily passed around.

Any possible prejudice was eliminated by the judge's limiting the amount of evidence admitted. The notebook found in defendant's room contained about one hundred pages, but the judge allowed the prosecutor to admit only a few. After four items had been admitted, defense counsel objected to the admission of additional items and the judge observed that the evidence was getting cumulative. Although he allowed the prosecutor to admit a few more pages, he refused to admit several items the State had presented. The judge did not abuse his discretion in admitting

into evidence some of the anti-Semitic material seized from defendant's bedroom. *State v. Marrero, supra,* 148 *N.J.* at 483–84, 691 *A.*2d 293. He properly followed our decision that this material had probative value.

## IV

██ Defendant asserts for the first time that the judge gave an inadequate instruction on the use of "other bad acts" evidence denying defendant due process of law and a fair trial. We find this contention to be entirely unfounded. *R.* 2:11–3(e)(2). Defendant's additional claim that these instructions were also erroneous because they failed to refer to the lesser forms of homicide is also without merit. *Id.* Contrary to defendant's contention, these instructions did not have the capacity to cause the jury to focus solely on the murder charge and equate defendant's genocidal hatred of blacks with the murder of Dick, rather than with a lesser motive to assault without the purpose to commit murder. Defendant provides no authority to support the proposition that a judge is required to refer to the lesser forms of homicide in giving a limiting instruction on the proper use of other bad acts evidence.

## V

██ Defendant also alleges plain error in that the instructions failed to inform the jury that it could not consider the other bad-acts evidence until after it had determined, from independent evidence, that defendant committed the homicide. We agree that the law is that the jury should be instructed that it cannot consider the "other crimes, wrongs, or acts" evidence until it has found defendant guilty of the homicide beyond a reasonable doubt independently from the other evidence. *State v. Marrero, supra,* 148 *N.J.* at 495–96, 691 *A.*2d 293. However, in light of the otherwise comprehensive limiting instruction, the failure to include this language in the instruction was at most harmless error. *See State v. Hunt,* 115 *N.J.* 330, 363–64, 558 *A.*2d 1259 (1989) (holding

that failure to give a limiting instruction on the proper use of "other crimes, wrongs, or acts" evidence was harmless error).

■■■ Defendant's related contention that the instructions were erroneous because they failed to explicitly inform the jury not to use the evidence to determine that defendant was predisposed to commit the attack is likewise harmless error. An anti-propensity instruction is an important part of a limiting instruction on the proper use of "other crimes, wrongs, or acts" evidence. *State v. Marrero, supra,* 148 *N.J.* at 496, 691 *A.*2d 293. In *Marrero,* the judge did not specifically inform the jury that it could not use the other crime evidence to conclude that the defendant was a bad person or that he had the propensity to commit the crime for which he was on trial. *Id.* at 495, 691 *A.*2d 293. Our Supreme Court nevertheless found that the instruction was adequate because the judge implicitly told the jurors that they could not use the other crime evidence for propensity when it instructed them not to use such evidence for any other purpose except for motive and intent on the homicide charge. *Id.* at 496, 691 *A.*2d 293.

Here, the judge not only instructed the jury not to use the material seized from defendant's bedroom for any other purpose except for motive and state of mind, he, unlike the trial judge in *Marrero, id.* at 495, 691 *A.*2d 293, instructed the jury not to use the evidence to conclude that defendant was a bad person and therefore must be guilty of murder. It is implicit in this instruction that the jury could not use the other bad acts evidence for propensity.

Here, as in *Marrero,* there is, at worst, an incomplete charge as opposed to a misstatement of the law. *Id.* at 496, 691 *A.*2d 293. In light of the otherwise comprehensive instruction, the omissions were not "clearly capable of producing an unjust result." *R.* 2:10–2.

## VI

Defendant next urges that all of the material obtained from his bedroom must be suppressed since it was obtained as a result of a

warrantless and nonconsensual search, whereby three incriminating papers were found which provided a key basis for the subsequent search warrant. We disagree.

While in the bedroom at the invitation and insistence of defendant's mother, the detectives saw three papers which they listed in the affidavit accompanying the application for a search warrant. Quigley saw two of the documents on the couch: (1) a drawing of a female, with her legs spread, which said, "Kristine Kapinski," and "[p]lease do not rape me;" (2) and a document which referenced an abandoned building known as the slaughterhouse which had been set on fire. Frohner saw the third document in plain view; a paper which appeared to portray a planned burglary of a local business, Weed's Texaco station, because it referenced where the station's safe was located.

The motion judge found that this was not a search, as the officers went into the bedroom at the insistence of defendant's mother and saw in plain view three papers which appeared to be evidence of multiple crimes. Based on those findings, he denied the motion to suppress the evidence. In *Crumb, supra,* 277 *N.J.Super.* at 311, 649 *A.*2d 879, we did not address this issue.

On appeal, defendant contends that these three papers found in defendant's bedroom were the result of a warrantless search of defendant's bedroom without a valid consent. He maintains that his mother did not and in fact could not consent to such a search.

Both officers testified that they did not search the room during the initial visit, they did not open any drawers, and they simply took a look at the room at the insistence of defendant's mother. Defendant points out that on cross-examination, Quigley acknowledged that in the affidavit accompanying the search warrant application, he indicated that "Mrs. Crumb gave the detectives verbal consent to search the room." Quigley then clarified that when he went in the room the first time, he really did not conduct a search and that the papers he viewed were in plain view lying around the room. He did not open any drawers. Defendant also points out that on cross-examination, Frohner acknowledged that

he wrote in his report that when he and Quigley were at the trailer home the first time they "discontinued the consent to search, exited the suspect['s] room and departed from the residence." However, he explained that although he used the word "searched" in the report, it was not an actual search—they went into the room and looked at things.

As long as the detectives observed the three documents in plain view, it is of no importance whether they also searched before obtaining the search warrant, as no other evidence was relied upon to obtain the warrant except the three items. The judge at the suppression hearing had the opportunity to hear and observe the testimony of the officers and defendant's mother. He made a decision to accept as credible the testimony of the two detectives and to discount the testimony of defendant's mother. The findings of the judge, who had the opportunity to see and hear the witnesses and also had a feel for the case, are entitled to deference. *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964). There was sufficient credible evidence in the record to support the trial judge's finding that the items were found in plain view. *Id.* at 162, 199 *A.*2d 809.

Nonetheless, the officers' actions implicate the Fourth Amendment and must be analyzed in terms of a search and seizure. The plain view doctrine is a recognized exception to the warrant requirement. *State v. Boynton*, 297 *N.J.Super.* 382, 394, 688 *A.*2d 145 (App.Div.), *certif. denied*, 149 *N.J.* 410, 694 *A.*2d 195 (1997). When evidence is in plain view, police have the power to seize evidence without a warrant. *Ibid.* However, "[f]or the plain view exception to apply, the police officer must rightfully occupy a position from which the evidence can be viewed." *Ibid.* (citing *State v. Bruzzese*, 94 *N.J.* 210, 235–38, 463 *A.*2d 320 (1983), *cert. denied*, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984)). The seizure is lawful "[w]here the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant

requirement." *Coolidge v. New Hampshire,* 403 *U.S.* 443, 465, 91 *S.Ct.* 2022, 2037, 29 *L.Ed.*2d 564, 582 (1971).

A warrantless search, particularly of a home, is presumptively unreasonable and illegal and will be justified only if it falls within a specific exception to the warrant requirement of the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution. *State v. Bolte,* 115 *N.J.* 579, 585, 560 *A.*2d 644, *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989); *State v. Dominick,* 298 *N.J.Super.* 108, 111, 688 *A.*2d 1138 (Law Div. 1996). The burden is on the State to prove that a warrantless search was justified by one of the exceptions. *State v. Young,* 87 *N.J.* 132, 142, 432 *A.*2d 874 (1981). Consent is a well-recognized exception to the warrant requirement. *State v. Smith,* 291 *N.J.Super.* 245, 258, 677 *A.*2d 250 (App.Div.1996), *certif. granted,* 149 *N.J.* 33, 692 *A.*2d 47 (1997); *State v. Allen,* 113 *N.J.Super.* 245, 251, 273 *A.*2d 587 (App.Div.1970). Consent may be obtained from a third party so long as the consenting party has the authority to bind the other party. *State v. Douglas,* 204 *N.J.Super.* 265, 276, 498 *A.*2d 364 (App.Div.1985), *certif. denied,* 102 *N.J.* 378, 508 *A.*2d 242 (1985) and 102 *N.J.* 393, 508 *A.*2d 253 (1986).

Thus, the detectives must have been rightfully present in defendant's bedroom to have the license to seize the three papers which they saw in plain view. Although they did not actually seize the papers on the initial visit into defendant's bedroom, they did use evidence of those papers as the basis upon which they requested a search warrant. Therefore, the same standards apply.

The legal test for determining whether defendant's mother had authority to admit the police officers "to take a look at" defendant's bedroom is constitutionally no different than the standard used to determine whether she had authority to consent to a search of the room. *People in Interest of R.A.,* 937 *P.*2d 731, 737 n. 6 (Colo.1997) ("A consent to enter a residence, like a consent to search, implicates the same concerns.") The Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect "[t]he right of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches *and* seizures...." *U.S. Const.* amend. IV; *N.J. Const.* art. 1, ¶ 7 (emphasis added); *see also Bruzzese, supra,* 94 *N.J.* at 216, 463 *A.*2d 320.

■ Although the detectives entered defendant's bedroom for the limited purpose of taking a look at it, their entrance into defendant's bedroom nonetheless constituted a "search" in the constitutional sense. *See Bruzzese, supra,* 94 *N.J.* at 235, 463 *A.*2d 320 (analyzing as a search and seizure issue, officers' action of following the defendant into his bedroom in effecting an arrest warrant resulting in plain view discovery of evidence, even though no exploratory search took place).

■ To determine whether a valid consent to search was given, the State must prove that defendant's mother possessed "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 *U.S.* 164, 171, 94 *S.Ct.* 988, 993, 39 *L.Ed.*2d 242, 250 (1974). The *Matlock* "common authority" rule looks to the consenting party's right to consent "in his [or her] own right" and circumstances showing that the accused had "assumed the risk." *State v. Douglas, supra,* 204 *N.J.Super.* at 277, 498 *A.*2d 364; 3 Wayne R. LaFave, *Search and Seizure* § 8.4(b), at 768 (3d ed.1996). Significantly, a police officer need not be factually correct; the officer need have only a reasonable belief that the consenting party has sufficient control over the property to consent to its being searched. *State in the Interest of C.S.,* 245 *N.J.Super.* 46, 50, 583 *A.*2d 785 (App.Div.1990) (citing *Illinois v. Rodriguez,* 497 *U.S.* 177, 184, 110 *S.Ct.* 2793, 2799, 111 *L.Ed.*2d 148, 159 (1990)).

New Jersey is among the overwhelming majority of courts holding that a parent has the right to consent to the search of the property of his or her son or daughter. 3 LaFave, *supra,* § 8.4(b), at 765; *State in the Interest of C.S., supra,* 245 *N.J.Super.* at 49, 583 *A.*2d 785; *State v. Douglas, supra,* 204 *N.J.Super.* at 278-80, 498 *A.*2d 364 (holding mother could consent to the search of her son's bedroom). Even in cases where the child has reached

adulthood, courts have been reluctant to find that the son or daughter had exclusive possession of a room in the parent's home. 3 LaFave, *supra*, § 8.4(b), at 769.

This capacity to consent has alternatively been based on the parent's authority as head of the household or owner of the property, the exercise of parental responsibility over the child, or as a co-tenant or co-occupant. *State v. Douglas, supra,* 204 *N.J.Super.* at 279, 498 *A.*2d 364; 3 LaFave, *supra*, § 8.4(b), at 765–71. In situations where another family member uses a part of the child's room for storage or other purposes, courts have concluded that the child did not have sufficiently exclusive possession of the room to render ineffective the parent's authority to consent. *See United States v. Mix,* 446 *F.*2d 615, 618 (5th Cir.1971); *State v. Jones,* 193 *Conn.* 70, 475 *A.*2d 1087, 1094 (1984); *Stokes v. State,* 548 *So.*2d 118, 122 (Miss.1989), *cert. denied,* 493 *U.S.* 1029, 110 *S.Ct.* 742, 107 *L.Ed.*2d 759 (1990); 3 LaFave, *supra*, § 8.4(b), at 766.

Another factor considered in determining whether the child had exclusive possession of the room is whether the child paid rent for the room. *United States v. Block,* 590 *F.*2d 535, 538 (4th Cir. 1978); 3 LaFave, *supra*, § 8.4(b), at 766. An informal agreement that the child would pay rent when able to do so with no specified amount fixed has been held inadequate to give the child exclusive possession of the room. *State v. Swenningson,* 297 *N.W.*2d 405, 406 (N.D.1980). Cases which have upheld a parent's authority to consent to the search of the room of an adult son or daughter still living at home have turned on whether the adult offspring paid rent or utility bills and whether the parent had access to the room. *United States v. Evans,* 27 *F.*3d 1219, 1230 (7th Cir.1994); *Smith v. State,* 264 *Ga.* 87, 441 *S.E.*2d 241, 243 (1994); *State v. Packard,* 389 *So.*2d 56, 58 (La.1980), *cert. denied,* 450 *U.S.* 928, 101 *S.Ct.* 1385, 67 *L.Ed.*2d 359 (1981). Another consideration is whether the parent had ready access to the defendant-child's room to clean it. *Perry v. State,* 538 *N.E.*2d 950, 951 (Ind.1989); 3 LaFave, *supra*, § 8.4(b), at 766.

The Fourth Amendment proscribes only those searches and seizures that are judicially determined to be unreasonable. *Bruzzese,* 94 *N.J.* at 217, 463 *A.*2d 320. "Indeed the touchstone of the Fourth Amendment is reasonableness." *Ibid.* "Fourth Amendment issues are complex and are 'peculiarly dependent upon the facts involved.'" *State v. Zapata,* 297 *N.J.Super.* 160, 171, 687 *A.*2d 1025 (App.Div.1997) (quoting *State v. Anderson,* 198 *N.J.Super.* 340, 348, 486 *A.*2d 1311 (App.Div.), *certif. denied,* 101 *N.J.* 283, 501 *A.*2d 946 (1985)).

We conclude that under the circumstances presented here, the entry into defendant's bedroom was reasonable. Objectively, a police officer would have reasonably believed that defendant's mother had authority to admit the police authorities into defendant's bedroom. Family members had access to defendant's bedroom, as the door to defendant's bedroom was off of the hinges and leaning against the wall inside of the room. In *State v. Douglas, supra,* we concluded that where there was no door separating the defendant-child's bedroom from the remainder of the apartment, there could be no expectation of privacy. 204 *N.J.Super.* at 280, 498 *A.*2d 364. Although defendant's mother claimed that she no longer cleaned defendant's room, she admitted that she had recently gone in there to wipe off writing on the mirror. Furthermore, defendant's aunt was allowed to store clothes in the closet in defendant's room. Defendant's mother was co-owner of the trailer home along with her husband, and although she claimed defendant paid rent, she essentially acknowledged that the agreement was informal. Further, the judge rejected her testimony that defendant paid rent. It is significant that the mother was concerned that her son was involved with the wrong people; by insisting that the officers look at his bedroom, she was exercising parental responsibility over her son's behavior.

There was no reason for the detectives to believe that defendant's mother had any less than the normal free access to all of the rooms in the trailer that heads of households typically exercise. Because she had joint access to the bedroom, defendant

assumed the risk that his mother might permit the room to be searched. Since defendant's mother could consent to the search of her son's bedroom, she had authority to ask the officers "to take a look at" defendant's bedroom. Thus, the officers were rightfully present in defendant's bedroom when they saw the three items in plain view.

For an item found in plain view to be admissible, the police officer must (1) be legally in a position to view the evidence; and (2) have probable cause to associate the item with criminal activity. *State v. Damplias*, 282 *N.J.Super.* 471, 477–78, 660 *A.*2d 570 (App.Div.1995). As we have concluded that the detectives were rightfully present in defendant's bedroom, and thus, were legally in a position to view the papers, only the second requirement need be discussed further.

Defendant argues that prong two is absent in that Quigley and Frohner were given permission only to view the disarray of the bedroom and that by picking up defendant's personal papers and reading them, the detectives exceeded the scope of the permission that they were given. He argues that the incriminatory nature of the papers was not immediately apparent, and therefore, not in plain view.

Defendant relies on *Arizona v. Hicks*, 480 *U.S.* 321, 325–26, 107 *S.Ct.* 1149, 1153, 94 *L.Ed.*2d 347, 354–55 (1987), in which the Court held that the police officer's movement of stereo equipment in order to obtain serial numbers during an unrelated warrantless search of the accused's apartment, absent probable cause to believe the equipment was stolen, was an unreasonable search in violation of the Fourth Amendment. He also relies on *Coolidge v. New Hampshire, supra*, 403 *U.S.* at 466, 91 *S.Ct.* at 2038, 29 *L.Ed.*2d at 583, in which the Court held that for a plain view search to be valid, it must be "immediately apparent" that the incriminating evidence is seizable as evidence of a crime.

The present matter is distinguishable from *Hicks* and *Coolidge* in that here the detectives could readily tell that there was

probable cause that the papers were evidence of criminal activity. Defendant's contention that the incriminatory nature of these papers was not immediately apparent is contrary to their testimony and the evidence. The detectives were in the bedroom for only five minutes when they saw these papers. One paper bore the name of one of the victims of the sexual assaults that the officers were investigating with the writing, "[p]lease do not rape me"; the second referenced an abandoned building which the officers knew had been burned down under suspicious circumstances; and the third portrayed an apparent planned burglary outlining a local gas station including the location of the safe. These papers were in plain view lying around the room and the incriminating nature of the papers viewed was obvious and immediately apparent. The facts do not support the defendant's view that the detectives exceeded the scope of the consent granted them. *Cf. State v. Younger,* 305 *N.J.Super.* 250, 702 *A.*2d 477 (App.Div.1997) (holding that officers exceeded the scope of consent to search for a gun by opening a small change purse containing drugs).

In *United States v. Crouch,* 648 *F.*2d 932 (4th Cir.), *cert. denied,* 454 *U.S.* 952, 102 *S.Ct.* 491, 70 *L.Ed.*2d 259 (1981), federal agents, who were executing a search warrant directed at the seizure of chemicals and drug paraphernalia, removed letters from unsealed envelopes. *Id.* at 933. After examining the letters, the agents seized them because they contained information relating to the manufacture of a controlled substance. *Ibid.* The court upheld the seizure under the plain view doctrine, adding that it "attach[ed] no significance to the fact that some cursory reading of the letters was necessary in order to establish their nature." *Ibid.Accord Mapp v. Warden,* 531 *F.*2d 1167, 1172 (2d Cir.), *cert. denied,* 429 *U.S.* 982, 97 *S.Ct.* 498, 50 *L.Ed.*2d 592 (1976) (holding that rent receipts were properly seized in plain view even though their incriminating nature was apparent only after the police noticed a suspicious name on them.)

The detectives' cursory reading of these three papers to ascertain their nature was not significant. It was within the scope of

the permission that they were given to take a look at defendant's bedroom. As the State notes, the incriminating character of these drawings and writings "became clear at a glance." Thus, the judge did not err in refusing to suppress the material obtained from defendant's bedroom. The warrantless entry into defendant's bedroom was justified under the consent exception to the warrant requirement. The three incriminating papers seen in plain view were permissibly used to obtain a search warrant.

## VII

For the first time on appeal, defendant argues that the trial judge's instruction regarding the jury's obligation to assess the credibility of defendant's statement erroneously omitted any reference to the credibility of the multiple written statements seized by police and the various alleged admissions made by defendant to five different persons. Defendant asserts that the charge erroneously did not refer to his statement to the prosecutor's investigator, his statements in his writings, and his statements to non-police witnesses. Defendant points out that the new Model Jury Charge on "Statements of Defendant," revised after the conclusion of this trial, is not limited to custodial statements.

In determining whether a charge was erroneous, the portions alleged to be erroneous cannot be read in isolation; the charge must be read as a whole to determine its overall effect. *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). Nonetheless, erroneous instructions on matters which are material to the jury's deliberation on criminal charges are presumed to be reversible error. *State v. Warren,* 104 *N.J.* 571, 579, 518 *A.*2d 218 (1986). Although this presumption of prejudicial error exists even when no objection to the charge was raised below, *State v. Federico,* 103 *N.J.* 169, 176, 510 *A.*2d 1147 (1986), nonetheless, where "defendant did not request or object to the court's failure to give" certain instructions to the jury, we will reverse a conviction only where the omission was erroneous in view of the nature of the evidence presented at trial and was "clearly capable of producing

an unjust result." *R.* 2:10–2; *State v. Jordan,* 147 *N.J.* 409, 421–22, 688 *A.*2d 97 (1997); *State v. Baldwin,* 296 *N.J.Super.* 391, 395, 686 *A.*2d 1260 (App.Div.), *certif. denied,* 149 *N.J.* 143, 693 *A.*2d 112 (1997).

In *State v. Hampton,* our Supreme Court ruled that where an out-of-court inculpatory statement consists of the defendant's confession to police, the jury should be instructed to decide whether, in view of "all the circumstances attending," the statement is true or untrue, and if untrue, to "treat it as inadmissible and disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence." 61 *N.J.* 250, 272, 294 *A.*2d 23 (1972). The New Jersey Rules of Evidence codified the *Hampton* holding and state that if the judge admits a defendant's statement, "the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible." *N.J.R.E.* 104(c).

A *Hampton* instruction is "designed to 'insure to a defendant an unfettered factual consideration by the jury of the credibility' of all or part of his confession." *State v. Boyle,* 198 *N.J.Super.* 64, 74, 486 *A.*2d 852 (App.Div.1984) (quoting *State v. Bowman,* 165 *N.J.Super.* 531, 537, 398 *A.*2d 908 (App.Div.1979)). Where a defendant's oral or written statements, admissions, or confessions are introduced in evidence, the *Hampton* charge must be given whether or not it is requested. *State v. Jordan, supra,* 147 *N.J.* at 425, 688 *A.*2d 97. The Court stated that by using the term "shall" in *N.J.R.E.* 104(c), it recognized that a *Hampton* instruction is required. *Ibid.*

In *State v. Baldwin, supra,* a panel of this court stated that "a special cautionary instruction is not required when a defendant has allegedly made a voluntary inculpatory statement to a non-police witness without being subjected to any form of physical or psychological pressure." 296 *N.J.Super.* at 398, 686 *A.*2d 1260. Although in *State v. Jackson,* 289 *N.J.Super.* 43, 51, 672 *A.*2d 1254 (App.Div.1996), *certif. denied,* 148 *N.J.* 462, 690 *A.*2d 609 (1997), a

case cited by defendant, this court had earlier held that "[a]ny statement of a defendant" is subject to the requirement of *Hampton* and *N.J.R.E.* 104(c), the *Baldwin* court "disagree[d] with the *Jackson* panel's broad pronouncement" and noted that in *Jackson* the spontaneous statements involved were made to the police. *State v. Baldwin, supra,* 296 *N.J.Super.* at 398–99, 686 *A.*2d 1260.

We will not join in the controversy because in any event, the failure to give a *Hampton* charge is not reversible error *per se. State v. Jordan, supra,* 147 *N.J.* at 425, 688 *A.*2d 97. "It is reversible error only when, in the context of the entire case, the omission is 'clearly capable of producing an unjust result....' " *Ibid.* (quoting *R.* 2:10–2). Here, the judge did give a *Hampton* charge, but referred only to defendant's statement in the singular. We see no possibility that the jurors failed to recognize that they were to assess the credibility of all of defendant's alleged out-of-court statements in determining whether to consider those statements as evidence of defendant's guilt.

## VIII

Defendant also urges us to find that the trial judge committed plain error by failing to give a *Kociolek* charge (*State v. Kociolek,* 23 *N.J.* 400, 129 *A.*2d 417 (1957)), as to the statements to Thomas and defendant's two friends. The *Kociolek* charge concerns the reliability of an inculpatory statement made by the defendant to any witness. *Id.* at 421–23, 129 *A.*2d 417. As explained in *Kociolek,* "in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer," the jury should be instructed to "receive, weigh and consider such evidence with caution." *Id.* at 421, 129 *A.*2d 417. In *State v. Jordan, supra,* our Supreme Court stated that, like the *Hampton* charge, the *Kociolek* instruction must be given whether or not it is specifically requested. 147 *N.J.* at 428, 688 *A.*2d 97.

The State argues that defendant did not allege that Thomas and defendant's two friends misconstrued or misrecollected; rather, he

asserted they lied. Even if correct, it would not negate the duty to instruct the jury to receive, weigh, and consider the evidence with caution. Nonetheless, we are convinced beyond any doubt that here the lengthy charge on credibility adequately instructed the jury on how to assess the witnesses' credibility. Although in *State v. Jordan, supra,* the Court noted that a general instruction on assessing credibility, absent specific credibility instructions concerning a defendant's statements, "may not always sufficiently impart to a jury its responsibilities and limitations," the failure to give a *Kociolek* charge is not reversible error *per se.* 147 *N.J.* at 428, 688 *A.*2d 97.

Where such a charge has not been given, its absence must be viewed within the factual context of the case and the charge as a whole to determine whether its omission was capable of producing an unjust result. *Ibid.* "There may be a rare case where failure to give a *Kociolek* charge alone is sufficient to constitute reversible error, or there may be a case where the omission of a *Kociolek* charge in combination with other errors (for example, no *Hampton* charge) may be reversible as plain error." *Ibid.* We have found no reported case in which a failure to include a *Kociolek* charge has been regarded as plain error. *Id.* at 427, 129 *A.*2d 417; *State v. Baldwin, supra,* 296 *N.J.Super.* at 400, 686 *A.*2d 1260. In any event, under the facts of this case, the failure to give a *Kociolek* charge was not capable of producing an unjust result. Here, the *Hampton* charge, along with the general and comprehensive credibility instructions, was sufficient.

## IX

We reject defendant's contention that the accumulation of errors denied him due process of law and a fair trial. *See State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954) (noting that where aggregate of errors render a trial unfair, a new trial is warranted.) Contrary to defendant's contention, any alleged errors were either not errors at all or were not prejudicial. "A defendant is entitled to a fair trial but not a perfect one." *State v. Marshall,* 123 *N.J.*

1, 170, 586 *A*.2d 85 (1991) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993) (quoting *Lutwak v. United States,* 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953)). The evidence of defendant's guilt was so clear and overwhelming that none of the errors alleged was capable of impairing the jury's ability to afford defendant a fair trial. Defendant's convictions are, therefore, sustained.

Affirmed.