**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1698-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHRISTOPHER COSTELLO,

     Defendant-Appellant.

_____

Argued January 10, 2022 – Decided January 27, 2022

Before Judges Sabatino, Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Criminal Part, Burlington County, Indictment No. 17-07-0790.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith Jr., of counsel and on the briefs).

Jennifer B. Paszkiewicz, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County Prosecutor, attorney; Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This direct criminal appeal concerns the killing of a drug dealer and the disposal of his dead body by his acquaintances—defendant Christopher Costello and his brother Bryan Costello—stemming from a dispute about money they owed him for drug purchases. The victim's remains were found by the police buried in the yard of the brothers' residence.

As part of its investigation, the State learned that defendant had admitted his involvement in the killing to a fellow inmate at the county jail. The police obtained a recorded statement from that inmate about what defendant told him.

Defendant's brother pled guilty to aggravated manslaughter. Consequently, the State's case went forward solely against defendant at two successive jury trials. At the first trial,[1] the jury found defendant guilty of desecrating human remains and hindering apprehension, and not guilty of murder, but it could not reach a unanimous verdict on the lesser included offense of aggravated manslaughter. That remaining count was tried a second time before a different jury, which found defendant guilty of aggravated manslaughter. He was sentenced to a custodial term of twenty years, subject to the parole ineligibility terms of the No Early Release Act, N.J.S.A. 2C:43-7.2.

---

[1] Defendant has not appealed his conviction of the offenses from the first trial.

A-1698-18

On appeal, defendant presents two arguments.

First, he contends he was denied his constitutional rights of confrontation of the former co-inmate because the State was allowed to present to the jury the inmate's police statement for the first time through a detective on the witness stand, after the inmate had already testified and had been cross-examined.

Second, defendant argues the trial court should have provided the jurors with an instruction that a person's "mere presence" at a crime scene is not enough to convict that person for aggravated manslaughter, even though his trial counsel had not requested that jury charge.

For the reasons that follow, we reject defendant's arguments and affirm the judgment of conviction.

I.

We derive the following facts and procedural history from the record.

The victim, Justin Dubois, was reported missing by his mother on October 31, 2016. Detectives in the Burlington County Prosecutor's Office began to investigate his disappearance. The detectives soon joined forces with the Guns, Gangs, and Narcotics Task Force ("the Task Force"), which had been investigating Dubois as the target of a narcotics operation since August 2016.

A-1698-18

Dubois was friendly with defendant and his brother, Bryan Costello. Dubois often would stay over their house in Lumberton. Dubois sold defendant and his brother heroin and other drugs.

Detectives learned that Dubois had last used his debit card at a Wawa store on October 27,[2] and his cellular company provided information that his phone was last operating on the same date.

Task Force personnel saw defendant driving Dubois's vehicle on October 28, the day after Dubois had been at the Wawa. The Task Force knew from its drug investigation that no one other than Dubois typically drove his car. Defendant made stops and purchases at a pet shop, a shoe store, a convenience store, and a home improvement store. At the home improvement store, defendant bought a pickaxe, shovels, gloves, and trash bags.[3] The Task Force also observed defendant wearing gloves while cleaning out Dubois's vehicle, which was parked, with its trunk and several doors open, in the driveway of the Costellos' home.

---

[2]  In a Wawa surveillance video taken on that date, Dubois was wearing a black knit True Religion hat, a blue or purple Nike zip-up jacket, and a pair of blue jeans with a white distinctive belt.

[3]  Defendant later admitted to returning some of the items on November 1 to get money to spend on drugs.

On November 2, Detective Nicholas Villano knocked on the Costellos' door, but no one answered. He believed that no one was home. The police eventually learned that defendant actually was home, but was ignoring their knocks.

Detective Villano interviewed one of the Costellos' next-door neighbors. The neighbor reported seeing Dubois at the Costello residence the previous week, noting he had been coming and going from their house for about the last eight weeks. The detective also interviewed Dubois's girlfriend, who gave a statement about the last time she had seen and heard from him.

On November 3, Detective Villano returned to the Costellos' house, where defendant, his brother Bryan, and their father[4] answered the door. The father said Dubois had not been there in three weeks, and his sons said they had heard Dubois was missing. They consented to the detective searching the home to see if Dubois was there. He was indeed not within the house.

Upon learning Dubois was not present, the brothers consented to going to the prosecutor's office to give statements. The father left for work. Some of defendant's statements contradicted information law enforcement had already

---

[4] The father was not a suspect in Dubois's murder.

A-1698-18

learned. This discrepancy caused Detective Villano to begin preparing a search warrant application for the Costellos' home, which was soon issued.

When the detectives returned to the residence with the search warrant later that day, they discovered freshly disturbed soil in the far end of the backyard. When they dug up that part of the yard, they found Dubois's body buried two feet deep, wrapped in a comforter and blue tarp.

Dubois had been severely beaten. He had received at least twelve blows to his head and had several other injuries on his neck, hands, face, and arms. He was wearing some of the clothing he had been wearing at Wawa on October 27. More of his clothing was found covered with blood stains in the Costello home, near the washing machine. Detectives also found in the house other belongings of Dubois, including his red Puma bag, smashed phone, car keys, car registration, and other papers belonging to him.

The brothers were consequently arrested on November 3. Defendant was held in the county jail.

About two years later, on November 18, 2016, Yasir Knight, one of defendant's fellow inmates, alerted prison officials that he had information about Dubois's killing, which defendant allegedly told him in jail. The prison officials contacted the prosecutor's office to report this, and Detective Villano soon after

interviewed Knight. According to Knight, he cut defendant's hair in the jail, and they were relatively friendly. Specifically, Knight told Detective Villano that defendant told him in jail that Dubois, who was defendant's and Bryan's roommate, had come to the house, telling the brothers they owed him money. Then the situation "turned physical."

According to Knight, defendant admitted that he beat Dubois with a baseball bat and his brother stomped on Dubois's head, "crushing his skull." Defendant admitted to Knight that when Dubois was dead, he and his brother wrapped Dubois's body in a tarp and buried him in their backyard.

Knight, who had been serving a 364-day sentence in the county jail, negotiated a plea bargain with the prosecutor's office in which he agreed to testify against defendant in exchange for a reduction of his sentence to time served. The police obtained a video-recorded sworn statement from Knight attesting to what defendant allegedly told him in jail.

The Indictment

On July 27, 2017, the Burlington County Grand Jury returned Indictment 2017-07-0790-I charging defendant and his brother Bryan with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:11-3(a)(2) (Count 1); second-degree desecrating human remains, N.J.S.A. 2C:22-1(a)(1) (Count 2); and third-

A-1698-18

degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (Count 3). The brothers' cases initially proceeded together until they were severed.

Pretrial Motions Before the First Trial

Several pretrial motions were filed and decided. In October 2017, the judge who was originally assigned to the case ("the first judge") suppressed the statements that defendant and his brother had made to the police. In November 2017, that same judge denied suppression of the search warrants issued for the Costellos' home, as well as the incriminating evidence found on the brothers' cell phones.

The First Trial

Defendant's first jury trial took place over several days in late February 2018 through early March 2018. Defendant testified in his own defense and denied involvement in the killing.

The court charged the first jury on the three charges stated in the indictment as well as aggravated manslaughter, a lesser included offense for murder. That jury found defendant not guilty of murder, but guilty of desecrating human remains and hindering apprehension to avoid detention. The jury was deadlocked as to his guilt of the lesser included of aggravated manslaughter.

A-1698-18

Defense's Motion to Dismiss the Aggravated Manslaughter Charge

In July 2018, the first judge heard argument on defendant's motion to dismiss the remaining charge of aggravated manslaughter. Defense counsel argued that the brother's guilty plea, and the corresponding factual basis for that plea stating that he alone had killed Dubois, required dismissal of the manslaughter charge against defendant. The State countered that the brother's plea colloquy did not completely exculpate defendant. The judge denied the dismissal motion for that reason.

Defendant's Motion to Suppress Evidence Before the Second Trial

Before the second trial, the State and defendant each moved to suppress various proofs, including: Dubois's possession of a weapon, the brothers' past drug use and debt, certain newspaper articles, a serology report, defendant's brother's plea colloquy, defendant's statements to the police, and Knight's statement to the police. The first judge, who was still handling the matter, heard argument on this motion on July 17, 2018.

The parties consented to the inadmissibility of Dubois's weapon possession and the brothers' prior drug use and debt. As to Knight's hearsay statement to the police, the judge ruled it could only be admitted as a prior

A-1698-18

consistent statement[5] if the defense impeached Knight's credibility first, but did not specify the procedure for how this should be done.[6]

The judge suppressed the admission of newspaper articles the State had proffered to show that Knight did not learn the content of defendant's jailhouse statement from outside sources. The judge reasoned there would be no way to establish that every piece of information about this case that Knight could have possibly referenced was in the public domain.

The serology report indicated that there was blood on a pair of work boots found in the Costello house within a trash bag containing items belonging to Dubois. The judge ruled the State could admit the report because it was consistent with other evidence and not particularly prejudicial. However, the judge did not rule on the admissibility of the corresponding and anticipated DNA report, which could indicate whose blood was on the boots, because that report was not completed by the time of the hearing. The judge advised that if the

---

[5] The applicable evidence rule, N.J.R.E. 803(a)(2), states in its present form that a declarant-witness's prior consistent statement does not violate the hearsay rule under the following conditions: "The declarant-witness <u>testifies and is subject to cross-examination about a prior otherwise admissible statement</u>, and the statement: (2) is consistent with the declarant-witness' testimony and is offered to rebut an express or implied charge against the declarant-witness of (A) recent fabrication or (B) improper influence or motive . . . [.]" (Emphasis added).

[6] This issue will be detailed more in Part II(A), infra.

A-1698-18

blood on the boots did not belong to Dubois, and it did belong to the defendant, that late discovery might be unduly prejudicial to the defense, as it was so close to trial. Therefore, the judge advised that the judge who had been assigned to preside over the second trial would make that decision once the DNA report was completed. The judge ruled to admit the factual basis of Bryan Costello's plea colloquy over the State's objection.

Finally, the first judge allowed the State to admit at the second trial certain portions of defendant's testimony at the first trial, including his testimony about going to the pet shop and the shoe store while Dubois's body was in his backyard under the statement against interest hearsay exception.[7]

The Second Trial

The second trial, which was presided over by a different judge ("the second judge") spanned seven days from late July 2018 through early August 2018.

The State called a number of witnesses, including: several law enforcement officers; a doctor who performed the victim's autopsy; employees of the pet shop and the shoe store that defendant visited; the victim's mother;

---

[7] Defendant's testimony would also be admissible as statements by a party opponent. N.J.R.E. 803(b)(1).

one of the Costellos' neighbors; a forensic scientist in the serology unit; a detective sergeant who had analyzed the brothers' cell phones; Detective Villano, the lead detective who had interviewed the brothers and Knight; and Knight. The State did not have an eyewitness to the killing, but instead tried to establish defendant's guilt through circumstantial evidence, his alleged admissions to Knight, and the forensic evidence.[8]

The defense at the second trial called defendant's brother and father. The defense also read into the record parts of defendant's testimony from the first trial. Defendant chose not to testify at the second trial. As with the first trial, the defense was that Bryan Costello had acted alone in killing Dubois.

Jury deliberations began on August 9 and continued one more day, on August 14. The jurors asked to rehear the testimony of the medical examiner "with regard to the number of assailants." They also asked to have the court replay the video of Knight's police statement. The court granted both of these requests. The jurors also posed a question for the court about the applicable law, which we will discuss in Part II(B), infra.

After further deliberations, the jury found defendant guilty of aggravated manslaughter.

---

[8] No DNA evidence implicating defendant was presented.

The trial court denied defendant's motion for a new trial. As we have already noted, the court sentenced him to a twenty-year prison term, subject to the NERA parole disqualifier, in September 2018.[9]

This appeal followed.

II.

On appeal, defendant presents the following arguments in his brief:

POINT I

DEFENDANT WAS DENIED HIS RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT AND ART. I, PAR. 10 OF OUR STATE CONSTITUTION WHEN THE PROSECUTION WAS ALLOWED TO PRESENT YASIN KNIGHT'S STATEMENT TO THE POLICE AS A PRIOR CONSISTENT STATEMENT WITHOUT KNIGHT BEING PRESENT AND SUBJECT TO CROSS-EXAMINATION.

POINT II

GIVEN THE JURY'S QUESTION, "DOES THE DEFENDANT NEED TO USE THE BAT OR DOES THE DEFENDANT MERELY NEED TO BE THERE TO BE FOUND GUILTY?" DEFENDANT WAS DENIED A FAIR TRIAL BY THE JUDGE'S FAILURE TO GIVE AN INSTRUCTION ON MERE PRESENCE.

We examine these two issues in turn.

---

[9] Defendant does not appeal his sentence.

## A.

Defendant challenges the admission of Knight's videotaped police interview, which the first judge had ruled was admissible for its truth as a prior consistent statement under N.J.R.E. 803(a)(2), on the condition that the defense first attack Knight's credibility on the grounds of recent fabrication or undue influence by the State.

Defendant specifically complains that the second judge allowed the State to play Knight's video to the jury during the direct examination of Detective Villano several days after Knight left the witness stand. He contends this sequencing deprived him of his right to confront Knight under the Confrontation Clauses of the Federal and State Constitutions. We disagree.

## 1.

Here is the pertinent chronology concerning this issue. For context, we include events from the first trial.

<u>Knight's Examination at the First Trial</u>

At the first trial, Detective Villano discussed how Knight approached his office with information about defendant's involvement in Dubois's murder. The detective did not read Knight's statement into the record.

A-1698-18

Knight testified at the first trial seven days after Detective Villano had already testified. Knight testified that he and defendant were in the same housing unit at the Burlington County Jail, and he would cut defendant's hair. He alleged that defendant told him that he and his brother beat and killed a man, whom they owed a lot of money.

When testifying at the first trial about what defendant told him about how the brothers beat Dubois, Knight did not remember what defendant said about Dubois's skull. The State refreshed his recollection with a transcript of the statement he had given the police, without presenting it to the jury at that point. Knight recalled that he told detectives that Dubois told him he and his brother "crushed" Dubois's skull.

Knight testified he got in contact with the prosecutor's office to tell them what defendant said and that they did not promise him anything in exchange for the information. However, his sentence was modified after he gave the statement.

On cross examination, defense counsel asked Knight, "So because you gave that statement you were given your freedom; is that fair to say?" to which he responded, "In essence, yes, ma'am." However, he continued to assert he went to the prosecutor's office and agreed to testify "to bring closure to the

A-1698-18

deceased's family and for the defendants to be held accountable"—not out of any mercenary gain, and that defendant's "demeanor in reference to him telling me about the brutal murder was very disturbing[.]"

The Suppression Motion Before the Second Trial

As we have already noted, the State moved in limine before the second trial to admit Knight's taped police interview as a prior consistent statement under N.J.R.E. 803(a)(2). The State advised the court at this motion that it again planned to call Knight to testify at the second trial, and if his testimony was indeed consistent with his taped statement, the State planned to also call the detective that took Knight's statement to testify about the interview and to play parts of it for the jury.

The prosecutor cited cases to support this procedure, arguing it should not just be "the prosecutor asking questions of the witness and saying you gave this statement here and you said this." As asserted by the prosecutor, the cases "actually deal with reading into the record the prior statement or playing the prior statement," not just "rehabilitation on direct." In response, the first judge remarked, "I don't know how I agree – if I agree with that entirely."

Defense counsel, meanwhile, objected to the proposed sequencing, asserting that defendant's right to confrontation would be violated if his attorney

did not have the opportunity to cross-examine Knight immediately on the contents of the taped police statement.

As we have noted, the first judge ruled that Knight's taped statement could be admitted but only if the defense first impeached his credibility at trial. Specifically, the judge placed the following guidance on the record:

> A prior statement may be admitted into evidence to support the credibility of a witness for the purpose of rebutting an expressed or implied charge of recent fabrication. So under [N.J.R.E.] 803(a)(2), it may be admitted into evidence substantively, does not require a limiting instruction to the jury if it's about improper influence or motive; that that's what the statement is being attacked on the basis of those issues; the scope of the exception encompasses prior consistent statements made by the witness before the alleged improper influence or motive to demonstrate that the witness did not change his story, which is what you're aiming for in this case, with regard to the statement that Yasin Knight would have made to the detectives.
>
> Here, at the first trial, defense counsel did attack the credibility of the witness Yasin Knight based on the subsequent shortening of his 364-day county jail sentence in exchange for truthful testimony. Although Yasin Knight did receive a [reduction] of the 364-day county jail sentence, this deal came after Yasin Knight gave his statement to Burlington County detectives on November 12th,[10] 2016. At the time he gave the

---

[10] Knight actually gave his statement on November 18, 2016. The State had a typo in his brief, which is what the judge was using as a reference during this oral ruling. The State clarified the date of the statement later in the hearing.

statement to the detectives, he was not promised a reduction in his jail sentence.

And so if – and <u>as I expect would happen [at the second trial], reasonably so, [defense counsel] is going to attack the credibility of Yasin Knight, then the State can rebut with the prior consistent statement of Yasin Knight to the detectives</u>.

[(Emphasis added.)]

This oral decision reflects that, consistent with N.J.R.E. 803(a)(2), the first judge correctly imposed a condition that Knight's statement to the police could only be admitted at the second trial if the defense impeached his credibility by bringing up the reduction in sentence he received after giving the police his statement and agreeing to testify against defendant. The judge did not specify, however, the procedure for how the video should be presented. The written order confirms the limited scope of her ruling: "The prior statement of Yasin Knight given to detectives on November 18, 2016 is admissible as rebuttal."

<u>Knight's Examination at the Second Trial and the Playing of the Video</u>

At the second trial, the State called Knight to testify about his alleged conversations with defendant while in jail. His taped statement was not introduced on direct examination. However, the prosecutor did show Knight the transcript of his statement. The prosecutor did so in order to refresh his recollection about what he reported to detectives that defendant told him in jail.

18

Knight testified that he and defendant first began talking about the murder when defendant asked Knight for help drafting an affidavit to get his brother out of jail to care for their sick father.

On cross-examination, defendant's trial attorney posed multiple questions to impeach Knight's credibility. She asked Knight if he saw the opportunity to present damaging information to the prosecutor about defendant as a "free get out of jail pass." Knight denied that characterization, testifying that he received an extra year of probation instead of having to complete the remainder of his 364-day-long jail term. Knight testified that he was motivated to come forward to "bring closure" to the victim's family.

Pressing further on the theme that Knight was biased for the State, defense counsel asked him, "And the reason you said that [you wanted to bring closure] many times is because you wanted to get something out of it for yourself. You cared only about yourself; isn't that true?" Knight responded, "Ma'am that's not true. If that was the case I wouldn't be here today. I'm not getting nothing for being here. I'm not getting nothing but badgered by you for being here. That's all I'm getting."

A-1698-18

Despite this extended direct examination and robust cross-examination, neither the prosecutor nor defense counsel asked Knight about the contents of his recorded statement to the police.

Detective Villano testified on August 7, one week after Knight had testified. This was in reverse order of how the two witnesses had testified at the first trial. Detective Villano explained that he learned about Knight from the Burlington County Prosecutor's Office, which had been told by the jail that someone had information on Dubois's homicide.

Detective Villano insisted that Knight did not ask for, nor did he offer Knight any favors in exchange for the information. At that point, the prosecutor expressed his plan to show the jury the video of Knight's police statement.

> [PROSECUTOR]: Judge, <u>I fully intend to play this video, as was my pretrial motion</u>, as a <u>prior consistent statement</u>, <u>since counsel impeached the witness on the stand</u> <u>regarding his, his later gift he received from the prosecutor's office, the lowering of the sentence</u>. And based on [the first judge's] ruling, this statement is admissible as a prior consistent statement.
>
> [DEFENSE COUNSEL]: I agree that the first judge did rule it as a prior consistent statement. However, my client has a Sixth Amendment right to face his accusers. So <u>if you play this, my client should be able, through me, to cross-examine Yasin Knight in what is said in the statement</u>. <u>It should have been played while he was on the stand</u>.

A-1698-18

[(Emphasis added.)]

The second trial judge ruled:

> I have got no problem having Mr. Knight called back if that was the position of you [i.e., defense counsel] and your client, you know.
>
> The order of this being played – and again I don't know if it will raise any questions. Obviously, I didn't make this pretrial ruling, [the first judge] did. I don't know the contents of the statement. I don't know whether it – the contents of this statement dated November 18th, 2016 in any way contradicts the testimony that was on the stand again, so I'm somewhat at a disadvantage, but I don't disagree with the precept [sic] that if there is something that emerges in this statement, which it was the subject of a pretrial motion, that if there is something that arises, I would entertain any argument by [d]efense counsel to be permitted to recall Yasin Knight, as in the form of like a rebuttal witness or to supplement the testimony.

[(Emphasis added.)]

Defense counsel continued to argue:

> However, Your Honor, I believe that [Knight] should be on the stand while this is being played. It is consistent with what he said in terms of stomping and hitting and all that, but he also goes on about other things, about righteousness and, you know so—
>
> [THE COURT]: I will say this, [defense counsel], that, you know, if you find that there is a necessity after this statement is played to recall Mr. Knight and you want to play it again in his presence in front of the jury, if that's what you would like to do, I would entertain that

21

application at that time. And I think it would – it would address any of the assessment of credibility by the jury. It would permit you an opportunity to confront him with any inconsistency that you and your client perceive in the testimony, so I don't have a problem with that, but I'm not going to just not have it played today and then go and find Mr. Knight. If there is a desire to have that done at a later date upon consultation with your client, then I would entertain it, but it was the subject of pretrial motion and I am going to permit it to be published to the jury now.

[(Emphasis added.)]

The video of Knight's police statement was then played for the jury. Among other things, it contained Knight's sworn assertions that defendant told him he had argued with Dubois in the house about owing money, that defendant had retrieved a baseball bat and struck Dubois with it, and that defendant's brother then entered the fray and "stomped" on Dubois.

Before the video was played, the State continued with its examination of Detective Villano. The detective acknowledged that Knight's sentence was amended after he gave his police statement. Instead of serving 364 days, Knight was released after 93 days, but received another year of probation. Then the State played the video of Knight's taped statement to detectives, and defense counsel cross-examined Detective Villano.

22

A-1698-18

Upon completion of the witnesses, the court gave counsel time to make any motions for further testimony or limiting instructions or on any other issue. Notably, defense counsel did not request the trial judge to recall Knight. Counsel did move for acquittal, however, based on various "errors of the [c]ourt." The judge's ruling concerning Knight's statement, however, was not identified or argued as one of these errors. The judge denied the motion.

2.

Defendant argues the trial court deprived him of his constitutional right to confront Knight in two ways. First, he contends the second judge erred by failing to act as an appropriate gatekeeper in safeguarding his right to cross-examine Knight about his police statement. In this regard, defendant points out the judge only stated he would "entertain" a request by defense counsel to recall Knight, "as in the form of like a rebuttal witness or to supplement the testimony" after Knight's taped statement to law enforcement was played for the jury as part of the State's direct examination of Detective Villano. Defendant argues his trial counsel instead had the unqualified right to question Knight about the police statement and that it was not the court's role to just "entertain" such a "request."

23

Second, defendant argues the court permitted a sequencing of the testimony that he claims is forbidden by the Confrontation Clause. He argues that requiring defendant to recall Knight to the witness stand in order to cross-examine Knight on the contents of his taped police statement improperly places the burden onto the defense to produce a witness. In this regard, defendant cites to the United States Supreme Court's majority opinion in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009), which observed that "the Confrontation Clause imposes a burden on the prosecution to present its witness, not on the defendant to bring those adverse witnesses into court." (Emphasis added). Defendant maintains his confrontation rights were not satisfied by being offered merely the opportunity to recall and re-question the declarant with supplemental queries only after his hearsay statement had already been introduced through the testimony of a different witness, Detective Villano.

These confrontation arguments fail for several reasons.

It is well established, of course, that a criminal defendant, subject to certain limitations, has a federal constitutional right under the Sixth Amendment[11] to confront and cross-examine witnesses. Since its seminal 2004

---

[11] The right of confrontation under the New Jersey Constitution has been construed coextensively with the federal Sixth Amendment, which reads, "In all

opinion in <u>Crawford v. Washington</u>, the United States Supreme Court has interpreted that right to apply to "testimonial" hearsay statements of declarants. 541 U.S. 36, 50-52 (2004).  There is no dispute here that Knight's recorded sworn statement to the officers is a testimonial statement that activates defendant's right of confrontation.  The question is whether defendant was deprived of that constitutional right.  We conclude he was not.

To begin with, it must be remembered that defendant did cross-examine Knight—indeed, in a vigorous manner—after Knight testified for the State in its case-in-chief.  The substance of the direct examination was defendant's alleged jailhouse admissions to Knight of having participated in Dubois's killing.  After Knight testified about those alleged admissions, defense counsel cross-examined Knight at length, in an effort to impeach him as a biased witness who had obtained a favorable deal to get out of jail.

The cross-examination went to the heart of Knight's credibility.  It was an attack on his truthfulness that insinuated recent fabrication and improper influence by the State.  Pursuant to N.J.R.E. 803(a)(2) and in accordance with the court's pretrial ruling, the attack opened the door for the State to counter it

---

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.

with Knight's recorded police interview as a prior statement consistent with his trial testimony. The prior statement was presented to reinforce what Knight had already told the jury and about which defense counsel had cross-examined him.

We agree with defendant that he was entitled under the Confrontation Clause to delve further, and to cross-examine Knight about his police statement. But he was not deprived of that opportunity. Although the second judge's choice of words about "entertaining" a defense request to recall Knight could have been phrased better, nothing prevented defense counsel from making that request once Knight's recorded statement was played. For reasons not explicit on this record, we do not know why defense counsel chose not to do so.

Perhaps defense counsel, for strategic reasons, felt she had adequately discredited Knight as a biased witness and did not need to punctuate the theme any further. If she had recalled Knight to ask him even more questions,[12] the State then would have had the right to follow up with more questions, and so on—just as the State presumably would been allowed to pose further queries on additional re-direct if the defense had cross-examined Knight about the police statement when he was originally on the stand. If, in fact, the defense did hold

---

[12] The State acknowledged during appellate oral argument that defense counsel would have been allowed to ask leading questions of Knight, if he were recalled, as a hostile witness. See N.J.R.E. 611(b).

back on asking additional cross-examination questions for strategic reasons, our Supreme Court has made clear such reasons do not justify a claim of a Confrontation Clause violation. State v. Nyhammer, 197 N.J. 383, 413-14 (2009) (finding no Confrontation Clause violation where defense counsel elected to refrain from asking on cross-examination certain questions of a child victim whose out-court-statements were admitted under a hearsay exception).

The sequencing in this case did not violate applicable Confrontation Clause precedents. The Supreme Courts of the United States and this State have not held that courts must follow a prescribed sequence for confronting a witness about that witness's admissible hearsay statements. Defendant's citation to Melendez-Diaz is unavailing because there the Court was addressing contexts in which the prosecution never produces the testimonial hearsay declarant as a trial witness, such as attempting to use a lab analyst's written report in lieu of the analyst's testimony. 557 U.S. at 324-25. Nor have any opinions from this court held that the sequencing used here was unconstitutional.

That said, we caution that we are not endorsing the sequence the prosecution used here as a model practice. If, for instance, Knight had died or disappeared in the interim and could not be recalled as a witness, defendant would have had a strong argument that his confrontation rights had been

A-1698-18

curtailed. The risk of the State's promise to produce the witness at a later time not being fulfilled could be considerable. Here, however, there is no indication that Knight was unavailable to be recalled.

We decline to resolve here all of the sequencing possibilities. For example, we need not decide whether it might be also permissible or preferable to suspend the direct examination of the declarant-witness, permit the State to call an officer to lay the foundation in which the police had obtained the witness's sworn statement, and then resume the witness's examination by both parties. Other procedures may also be sensible in the trial court's discretion. See N.J.R.E. 611(a) (recognizing the trial court's wide latitude over the manner in which witnesses are presented). Our point is that the Confrontation Clause does not compel a particular sequence, so long as there is a fair opportunity for defense counsel to cross-examine the declarant-witness.

Lastly, we discern no actual prejudice to defendant arising from the sequence used here. As we have noted, his trial counsel vigorously cross-examined Knight about his inferable bias for the State and motive to exaggerate or fabricate what defendant allegedly told him at the jail. The thrust of the impeachment had already occurred. Counsel chose not to pursue the opportunity

28

to ask Knight more.  The one-week delay between Knight's testimony and the playing of his recorded statement was not unconstitutionally prejudicial.

Accordingly, we reject defendant's novel claims of deprivation under the Confrontation Clause.

B.

Defendant's second argument, which was not raised during the trial, concerns the omission of a "mere presence" jury instruction.  This argument also does not compel reversal.

The pertinent chronology on this issue is as follows.  Before the closing arguments at the second trial, the trial court provided both counsel with a draft of the final jury charge on the morning of August 9 for them to review.  The judge and counsel discussed clarifying the language used for causation, and the judge accepted the defense's suggestion.  There was some debate about the instruction for how the jurors should use the prior convictions of Knight, as well as the factual basis of Bryan Costello's plea, neither of which is the subject of this appeal.  The judge adopted a limiting instruction for both of those issues with the consent of counsel.  No request for a "mere presence" charge was made at the charge conference.

A-1698-18

After the closing arguments were presented that same day, the court charged the jury. The final charge included, among other things, customary language about the elements of aggravated manslaughter and principles of recklessness and causation. After the charge was read, the judge asked counsel if they wanted to place anything else on the record. Both parties' counsel noted a few typographical errors in the jury charge and verdict sheet, but those were the only errors identified. Again, defense counsel made no request to add an instruction on mere presence.

About twenty minutes after they were charged, the jurors submitted a question to the judge asking, "Does the defendant need to use the bat or does the defendant merely need to be there to be found guilty?"

The trial judge conferred with the two attorneys about the jury's query. First, he suggested telling the jury to review the jury instruction for aggravated manslaughter again, a proposal which both parties accepted. In agreement with the judge's decision, defense counsel said, "[W]e can't interpret the law or the evidence for them, they have to." Contemplating how he might respond to the jury, the judge offered, "If the defendant caused the death under any manner in any way, shape, or form, whether it be striking, kicking, using a bat, whatever it might be, that would comport with the law." Defense counsel did not favor

such elaboration, worrying such detailed language was too suggestive. Counsel advocated the judge should just re-read to the jury the relevant portion of the charge. Implicitly accepting defense counsel's point, the judge omitted such detail in his response.

Following this colloquy, the judge responded to the jury's question as follows:

> A person is guilty of aggravated manslaughter if he recklessly causes the death of another person under circumstances manifesting extreme indifference to human life.
>
> In order for you to find the Defendant guilty of aggravated manslaughter, the State is required to prove each of the following elements beyond a reasonable doubt: One, that the Defendant caused Justin Dubois' death; and two, that the Defendant did so recklessly; and, three, that the Defendant did so under circumstances manifesting extreme indifference to human life.

After this instruction, the jurors resumed their deliberations and returned a guilty verdict the next day they were in court.

After the return of the guilty verdict, defense counsel moved for a new trial, which the judge denied. Defense counsel acknowledged she should have requested that a "mere presence" instruction be given to the jury in response to its question whether it was enough for defendant to be "merely present" at the

31

scene to be found guilty of aggravated manslaughter, but she candidly "didn't think of it at that time." Nevertheless, defense counsel argued, in retrospect, the judge had an affirmative duty to clear up the jury's expressed confusion with a "mere presence" charge, and his response to their question did not do so.

The judge denied the motion for a new trial because at the end of the second trial, defense counsel had many opportunities during the charge conference to object or add to the language of the jury instructions and she did not raise this issue, nor any related issue. Counsel only asked for instructions about defendant's choice not to testify at the second trial. Indeed, she expressed affirmative agreement with the judge's suggested, and ultimate, response to the jury's question, arguing against the inclusion of more detail. The judge noted that defense counsel did not submit any objection to his proposed response to the jury question, and so a new trial was not warranted on this ground.

The model charge on "mere presence" reads, in part, as follows:

> Mere presence at or near the scene does not make one a participant in the crime nor does the failure of a spectator to interfere make him/her a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he/she was present as an accomplice.
>
> [Model Jury Charge (Criminal) "Liability for Another's Conduct, Accomplice" (June 7, 2021).]

A-1698-18

Although this charge is more commonly appropriate in cases charging conspiracy or accomplice liability, case law has not confined its use to only those situations. See State v. Hakim, 205 N.J. Super. 385, 388 (App. Div. 1985) (holding that accomplice liability does not need to be alleged in the indictment for judge to charge jury on such a ground when "the evidence indicates a rational basis for accomplice liability").

Here, there was a plausible factual basis for providing this instruction as part of the final charge. Although defendant's position was that he had not been with his brother when the brother attacked Dubois, and the brother testified that he had acted alone, a jury could have reasonably concluded from the evidence that the brothers acted jointly in killing the victim. Alternatively, the jurors could have reasonably concluded that defendant was only present when Dubois was struck with a baseball bat and stomped on, and he personally did nothing to aid in the attack.

The State asserts it did not request an accomplice liability charge because its theory was that defendant and his brother were both principals of aggravated manslaughter. In State v. Crumb, 307 N.J. Super. 204, 221-22 (App. Div. 1997), this court held that a defendant was not entitled to an accomplice liability instruction where "the State prosecuted him as the principal and the defendant

argued that he did not commit the crime at all." Nonetheless, if a mere presence charge had been timely requested, the court would have been justified in giving it.

That said, the core problem here is that defense counsel never requested the mere presence charge, despite having multiple opportunities to do so. In fact, after the jury's question was submitted, defense counsel urged the court to not say more than it planned to say in clarifying the elements of aggravated manslaughter.

We are mindful of the general principle that "[a]ppropriate and proper [jury] charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). Even so, the plain error standard of R. 2:10-2 applies to our review of the charge as a whole. Baum, 224 N.J. at 159.

Viewing the charge as a whole and the procedural chronology, we do not conclude the court's non-inclusion of a mere presence instruction was plain error in the circumstances presented. The mere presence charge is not contained within the model charge text or the associated court instructions for charging aggravated manslaughter in cases like this, where the State is not invoking

theories of accomplice liability or conspiracy.  The court was not obligated to insert the charge, sua sponte.

Further, the court did not commit plain error by not reading the mere presence charge in its response to the jury's question.  Again, in hindsight, that might have been a beneficial ad hoc response.  But defense counsel invited any error by agreeing to the language the judge suggested and advocating that he say no more beyond that.  State v. A.R., 213 N.J. 542, 561 (2013).  The doctrine of invited error "acknowledges the common-sense notion that a 'disappointed litigant' cannot argue on appeal that a prior ruling was erroneous 'when that party urged the lower court to adopt the proposition now alleged to be error.'"  Ibid. (quoting N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010)).

Although we appreciate trial counsel's candor about failing to request the charge, we do not fault the trial court for omitting it given the context in which the issue belatedly and extemporaneously arose.

In light of the circumstances presented here, we reject defendant's arguments for a new trial based on this issue.

## C.

All other arguments presented on appeal lack sufficient merit to warrant discussion.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1698-18